**[J-131-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 711 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of Sentence |
| | : | entered on June 9, 2015 in the Court of |
| | : | Common Pleas, Bucks County, Criminal |
| v. | : | Division at No. CP-09-CR-0001413- |
| | : | 2014. PSM denied 07/20/2015 |
| | : | |
| MARCEL EMANUEL JOHNSON, | : | ARGUED: December 6, 2016 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE DONOHUE**                                    **DECIDED: May 25, 2017**

In June 2015, Marcel Emanuel Johnson ("Johnson") was convicted of killing Ebony Talley ("Talley"), her unborn child, and her four-year-old daughter, R.R. He was sentenced to death for R.R.'s murder. In this automatic direct appeal,[1] Johnson raises nine issues for our review. Following our thorough consideration of these issues and for the reasons set forth below, we affirm his convictions and the imposition of the death sentence.

In November 2013, Talley was living in Apartment 604 of the Avalon Court Apartments in Bristol Township, Bucks County with R.R.[2] Early in the afternoon of

---

[1] 42 Pa.C.S. § 9711(h)(1).

[2] The apartment belonged to a woman named Gisele Ucci. At the time of these events, Ms. Ucci was temporarily residing in Argentina. She allowed Talley to stay in her apartment and use her vehicle, a maroon Cadillac, while she was away. For ease of (continued…)

November 25, 2013, Talley's mother and sisters arrived at Avalon Court to visit. Talley, who was twenty weeks pregnant, and her mother left briefly to obtain a money order for a partial amount of Talley's rent. Upon their return, Johnson arrived at the apartment. Johnson and Talley were friends and he was well acquainted with her visiting family members. Johnson was storing some of his belongings in the apartment and Talley occasionally allowed him to stay overnight. Johnson socialized with Talley and her family that afternoon. When Talley's mother and sisters left at approximately 2:30 p.m., Johnson remained.

Shortly thereafter, around 3:00 p.m, a fire was detected in Talley's apartment. The fire emitted a thick, black smoke that made it difficult for the responding firefighters to gain entry. Once inside, firefighters discovered Talley's lifeless body in the bedroom. Talley was lying face-down with numerous stab wounds to her head, neck and body. A plastic bag was also wrapped tightly around her head.[3] Small, empty yellow wax bags stamped in red ink with "#1 way to go" were found scattered around Talley's body. More of these distinctive empty wax bags were found in a shoebox in the bedroom. In the living room, the firefighters found an unresponsive R.R. in a pool of blood beneath an overturned couch. R.R. had been stabbed in the chest and bled profusely. She was rushed to the hospital, but pronounced dead soon after her arrival. Minutes before the fire was detected, a resident of Avalon Court observed Talley's vehicle speed out of the parking lot, hitting another vehicle in its haste. The resident noticed that vehicle was being driven by a black male.

---

(…continued)
reference, we refer to the apartment as Talley's residence and the maroon Cadillac as Talley's vehicle.

[3] Talley was also found to have been hit in the face with such force that one of her front teeth was knocked out.

While emergency responders were still at the scene of the fire, Johnson placed a series of calls to Talley's cousin, Brittany Coles. Ms. Coles, who had been alerted to what was happening at Talley's apartment and was in a frantic state, told Johnson about the fire. Because she was at work and could not leave, she implored Johnson to return to the apartment complex to obtain more information. Johnson refused, explaining that he wanted to avoid the police because there were outstanding warrants for his arrest. Later that afternoon, Johnson called Talley's sister, Paulina Burke. Ms. Burke informed Johnson that both Talley and R.R. had died. She asked Johnson to turn Talley's vehicle over to the police and otherwise aid in the police investigation. Again, Johnson refused, citing the outstanding warrants as the basis for his refusal.

In these phone conversations, Johnson indicated that he was calling from a friend's home in the Levittown Trace Apartment complex.[4] Based on this information, the police proceeded to the Levittown Trace Apartments at approximately 6:00 p.m. and located Talley's vehicle in the most remote portion of the apartment complex's parking lot. When the police approached the vehicle, they found it was vacant. They also noticed that the license plate had been changed, but the VIN number, which is visible through the windshield, verified that it was Talley's vehicle. Shortly after 7:00 p.m., Johnson entered the vehicle and began to leave the parking lot. The police immediately stopped him, utilizing a "felony stop" procedure. During a felony stop, the police officers remain shielded by their vehicles and, with weapons drawn, they instruct the motorist to exit his car, demonstrate that he does not possess a weapon, and lay on the ground before they approach. The police then transported Johnson to their headquarters for questioning. A subsequent search of Talley's vehicle revealed, among other items, a

---

[4] Both Ms. Coles and Ms. Burke testified that they knew Johnson's phone number but on the day in question, he called from a phone number that they did not recognize.

bundle of eight empty wax packets stamped in red with "# 1 way to go," in the ash tray. These packets were identical to the packets found around Talley's body and in her bedroom.

At the police station, Johnson waived his *Miranda*[5] rights and agreed to speak with investigators. He explained his friendship with Talley and acknowledged that he was at her apartment earlier that day. He stated that he left Talley's home on foot and met up with a friend named Eric Stahl, who was driving Talley's vehicle, and that Stahl gave him the keys later that day. After being confronted with evidence that conflicted with this account, Johnson changed his story and admitted both to taking Talley's car and her Xbox gaming system and hitting another vehicle as he did. When asked why he did not come to the scene of the fire or the police station at Talley's family's requests, he reiterated his concern about the arrest warrants. The police arrested Johnson that evening on charges of possession of drug paraphernalia based on items found in his possession when the police stopped him in Talley's vehicle.[6] That night, while he was in custody, the police obtained and executed a warrant for samples of Johnson's DNA, fingernail scrapings, hair samples and clothes.

In January 2014, Johnson was charged with the murders of Talley, R.R., Talley's unborn child and related crimes. While detained in the Bucks County Correctional Facility, Johnson admitted to another inmate that he killed Talley and that he killed R.R. because she could identify him as her mother's killer. Also while incarcerated, Johnson phoned his brother, Marquis Johnson, and told him that he hid "evidence" in a precise location at the Levittown Trace Apartments and asked him to retrieve it, admonishing

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Specifically, the police found in his pocket a bundle of small, clear, plastic Ziploc baggies commonly used to package controlled substances. N.T., 6/1/2015, at 87.

that the items should never see the light of day. Marquis did as his brother requested and retrieved a blue plastic glove containing 167 packets of heroin, all in wax packets stamped in red with "# 1 way to go," and a money order for eighty dollars.

A jury trial commenced in May 2015, at the conclusion of which Johnson was convicted of the first-degree murders of both Talley and R.R., third-degree murder of Talley's unborn child, arson (endangering people), and possessing instruments of crime.[7] During the penalty phase, the Commonwealth presented evidence of four aggravating factors as to Talley: torture; conviction of another murder at the same time of Talley's murder; involvement in the sale of narcotics at the time of the murder; and knowledge of Talley's pregnancy.[8] N.T., 6/8/2015, at 192-95. The Commonwealth pursued three aggravating factors with regard to R.R.: that R.R. was a witness to a murder and was killed to prevent her from testifying; conviction of another murder at the same time as R.R.'s murder; and that R.R. was less than twelve years old.[9] Id. at 197-200.

Johnson presented evidence in support of four mitigating factors: his lack of a significant history of prior criminal convictions; extreme mental or emotional disturbance at the time of the murders; and the fact that he was twenty-one at the time of the murders.[10] Id. at 200. Johnson also presented an assemblage of evidence under the catchall mitigating factor, 42 Pa.C.S. § 9711(e)(8), including evidence that Johnson's life up until the time of the murders was characterized by chronic and pervasive abuse, neglect and abandonment; that he suffered brain damage and had been diagnosed with

---

[7] 18 Pa.C.S. §§ 2502(a),(c), 2603(a), 3301, 907.

[8] 42 Pa. C.S. § 9711(d)(8), (11), (13), (17).

[9] 42 Pa.C.S. § 9711(d)(5), (11), (16).

[10] 42 Pa.C.S. § 9711(e)(1),(2),(4).

various mental illnesses; cycles of placement in and out of treatment programs; and a complete lack of any semblance of stability or permanence. The jury ultimately sentenced Johnson to death for R.R.'s murder and life in prison for Talley's murder.[11]

The trial court denied Johnson's post-sentence motions, after which Johnson filed this timely appeal. He presents several issues for our review, challenging the denial of his motions to suppress, evidentiary rulings, the sufficiency of the evidence, the trial court's refusal to allow Johnson to present certain mitigating evidence, the trial court's jury instruction during the penalty phase, the denial of his motion to preclude the Commonwealth from seeking the death penalty, and the constitutionality of the three statutory aggravating factors presented by the Commonwealth in connection with R.R.'s murder .

## I. Sufficiency of the Evidence

In all death penalty cases, this Court reviews the sufficiency of the evidence to ensure that it supports the verdicts of first-degree murder, whether or not the appellant raises the issue. *Commonwealth v. May*, 887 A.2d 750, 753 (Pa. 2005). When reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt. *Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014). The determination of whether sufficient evidence exists to support the verdict is a question of law; accordingly, our standard of review is de novo and our scope of review is plenary. *Id.*

---

[11] Johnson also received consecutive sentences of twenty to forty years of imprisonment for third-degree murder and ten to twenty years of imprisonment for arson, and a concurrent sentence of two and a half to five years for the possessing instruments of crime conviction.

To establish first-degree murder, the Commonwealth must prove that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill. *Id.* "Specific intent to kill may be inferred by the use of a deadly weapon upon a vital part of the body, and the Commonwealth may prove the specific intent to kill necessary for first-degree murder wholly through circumstantial evidence." *Id.*

The evidence, when viewed in the light most favorable to the Commonwealth, establishes these elements beyond a reasonable doubt. To begin, Johnson admitted to killing both Talley and R.R., thereby establishing that they were unlawfully killed and that Johnson killed them. In his confession, he stated that Talley "made [him] kill her[,]" and acknowledged killing R.R. so that she could not identify him as her mother's killer N.T., 6/1/2015, at 230, 233-35.

Substantial evidence also demonstrated that both victims were killed by the use of a deadly weapon on vital parts of the victims' bodies. Dr. Ian Hood, a forensic pathologist, testified that Talley suffered thirty-five stab wounds to her head, neck, chest and abdomen. N.T., 5/28/2015, at 205. One wound perforated the common carotid artery in her neck and two others entered her chest cavity, causing a collapsed lung and internal bleeding. *Id.* at 206-08. While Talley was incapacitated from blood loss, a plastic bag was secured over her head, "providing terminal asphyxia as a final mechanism of death[.]" *Id.* at 232. R.R. was stabbed in the upper chest, just below her collarbone. *Id.* at 194-95.

There was also circumstantial evidence of Johnson's guilt. Talley's mother and sister testified that when they left Talley's home, Johnson remained in the apartment with Talley and R.R. N.T., 5/28/2015, at 271; N.T., 5/27/2016, at 112. Fires were set on or immediately beside the incapacitated Talley and R.R, N.T., 5/27/2015, at 186-88,

and were discovered approximately half an hour after Talley's mother and sister left, just minutes after Johnson was observed fleeing the scene at a high rate of speed in Talley's vehicle. N.T., 5/29/2015, at 300. This evidence, when viewed in the light most favorable to the Commonwealth, places Johnson in the apartment at the relevant time. Moreover, Talley's DNA was found under Johnson's fingernails, which, according to expert testimony, was not the result of casual contact with Talley. *Id.* at 186-87. Dr. Hood testified that Talley's body bore multiple defensive wounds and that the relatively shallow depth of many of the stab wounds was the result of Talley's struggle against her assailant. N.T., 5/28/2015, at 205, 210. Johnson was observed to have recent lacerations on his hands and fingers just a few hours after the murders, and he had changed his clothes. N.T., 5/29/2015, at 233, 237-38.

Johnson raises a single challenge to the sufficiency of the evidence, claiming that it is insufficient to establish that he was the person who killed Talley and R.R. and set the apartment on fire. Johnson's Brief at 37. Notably, Johnson does not dispute the evidence detailed above. Instead, he directs our attention to other evidence. For instance, Johnson acknowledges that he fled Talley's apartment complex in a hurry, but argues that flight alone does not establish guilt. *Id.* at 38. He suggests that other people involved in the drug trade could have wanted to harm Talley, and presents an alternative scenario in which he arrived at the apartment only to find that it had been set on fire and fled in a panic. *Id.* at 38-39. He also points to the lack of blood found on his clothes and body, that his blood was not found in Talley's apartment, and that his DNA was not found on Talley. *Id.* at 39-40.

These alleged deficiencies of physical evidence were, however, offset by other evidence. For example, although Johnson points to the lack of blood on his clothing, there was testimony that Johnson changed his clothes between the time of Talley's

family's visit and his apprehension by the police a few hours later. N.T., 5/27/2015, at 113; N.T., 5/29/2015, at 41. Likewise, Johnson's focus on the absence of incriminating blood or DNA at the scene of the crime may be explained by testimony from a Commonwealth witness that the blood and DNA samples recovered from Talley's apartment proved to be unsuitable for testing. N.T., 5/29/2015, at 122-126.

More importantly, Johnson does not genuinely contest that the evidence presented by the Commonwealth, when viewed in the light most favorable to it, was legally sufficient to prove his guilt. Instead, his arguments seek to vitiate the weight of the evidence supporting his convictions and to undermine the credibility of the Commonwealth's witnesses. Seen in this light, Johnson's arguments are addressed to the weight of the evidence supporting his convictions, not the sufficiency of the evidence. *See, e.g.*, *Commonwealth v. Gibbs*, 981 A.2d 274, 281–82 (Pa. Super. 2009). Johnson has not raised a weight of the evidence claim in this direct appeal, and as such, it has not been preserved for appellate review. Pa.R.A.P. 302(a); *see also Commonwealth v. Freeman*, 827 A.2d 385, 402 (Pa. 2003).

## II. Suppression Issues

Johnson raises two issues in connection with the trial court's denial of his motions to suppress his statement to the police and evidence of him selling drugs with Talley. Our standard of review for such claims provides that we may consider only the Commonwealth's evidence and so much of the defense's evidence as remains uncontradicted when read in the context of the record as a whole. *Commonwealth v. Arter*, 151 A.3d 149, 153 (Pa. 2016). Where the record supports the suppression court's factual findings, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id.* As an appellate court, however, we are not bound by the suppression court's conclusions of law. *Id.*

Johnson first argues that the trial court should have suppressed his statement to the police because the police did not inform him that they were going to question him about the deaths of Talley and R.R. until after he waived his *Miranda* rights. Johnson's Brief at 25. Johnson protests that he had no indication as to the purpose of the interrogation and was under the reasonable (but mistaken) assumption that he was stopped by the police and brought in for questioning because of outstanding arrest warrants issued for summary, non-traffic citations. *Id.* at 28.

A waiver of *Miranda* rights is valid where the suspect is aware of the general nature of the transaction giving rise to the investigation. *Commonwealth v. Dixon*, 379 A.2d 553, 556 (Pa. 1977). "[O]nly when such knowledge is possessed by a suspect … can [he] be said to understand the consequences of yielding the right to counsel." *Id.* This is because "[i]t is a far different thing to forgo a lawyer where a traffic offense is involved than to waive counsel where first degree murder is at stake." *Commonwealth v. Collins*, 259 A.2d 160, 163 (Pa. 1969). When a defendant challenges the validity of his *Miranda* waiver on this basis, the Commonwealth must establish, by a preponderance of the evidence, that the defendant was aware of the reason for the interrogation. *Dixon*, 379 A.2d at 556. The Commonwealth can meet this burden through evidence of the circumstances surrounding the interrogation, such as "the fact that the interrogation follows hard upon the criminal episode and there is no circumstance lending ambiguity to the direction and purpose of the questioning." *Id.*

In the present case, the trial court found that substantial evidence supported Johnson's awareness that the police intended to question him about the fire and murders rather than warrants for non-traffic summary offenses. Trial Court Opinion, 3/23/2016, at 16-17. This evidence included: Johnson's knowledge of the fire and of Talley's and R.R.'s deaths, his understanding that the police wanted to inspect Talley's

vehicle as part of the investigation, and his possession of that vehicle. In light of these facts and the tight timeline between the murders and the police taking Johnson into custody, it was "completely illogical" for Johnson to think that a number of officers would "swoop down on him, [and] tak[e] him into custody in a car that was owned by a homicide victim or potential homicide victim … for some old summary citations, basically what amounts to a dispute between himself and the local [d]istict [c]ourt." N.T., 11/26/2014, at 19.

The trial court's factual findings are supported by evidence of record. Talley's cousin, Brittany Coles, testified that she knew Johnson through Talley. N.T., 11/25/2014, at 27. At about 4:30 p.m. on the day of the murders, Ms. Coles told Johnson that there was a fire in Talley's apartment and that she could not get in touch with Talley. *Id.* at 31. Talley's sister, Paulina Burke, testified that while she was at the hospital on the day of the fire, she received a phone call from Johnson. During this conversation, she told him that Talley and R.R. died. N.T., 9/16/2014, at 6; N.T., 6/30/2014, at 134. Ms. Burke knew that Johnson was driving Talley's car, and when she asked him to bring it to the police station for their investigation, Johnson refused, citing his outstanding warrants. N.T., 9/16/2014, at 6-7. At approximately 7:30 that evening, only a few hours after being told of the fire and Talley's and R.R.'s deaths, uniformed police officers stopped Johnson while he was driving Talley's vehicle, the plates on which had been changed. N.T., 6/30/2014, at 123. When brought to the police station following this felony stop, Johnson was taken to an interview room to be interrogated by Detective Slattery and Detective Fuhrmann. *Id.* at 100-01. In consideration of these facts,[12] we find no error in the trial court's conclusion that

---

[12] The record developed at trial established that the officers performed a felony stop when taking Johnson into custody, N.T., 6/1/2015, at 25, and that the felony stop procedure is more confrontational than a traffic stop. *Id.* No such evidence was (continued…)

Johnson was aware that the police intended to question him with regard to what occurred in Apartment 604 of the Avalon Court Apartments.

Johnson argues that his case is factually indistinguishable from *Dixon*. We disagree. In *Dixon*, a local magistrate convicted the defendant of malicious mischief and ordered her to pay restitution at the rate of fifty dollars a month, beginning in March 1973, until the $500 judgment was satisfied. *Dixon*, 379 A.2d at 555. The magistrate pointedly told the defendant that if she defaulted on her payments, a warrant would be issued for her arrest and police officers would be sent to arrest her. *Id.* The defendant failed to make even one payment, and as a result, a warrant for her arrest issued. *Id.*

That summer, the body of the defendant's young son was discovered in a wooded area and a police investigation ensued. *Id.* at 554. On August 14, 1973, three police officers appeared at the defendant's home and asked her to go with them to the police barracks. *Id.* The officers had in their possession the arrest warrant related to defendant's restitution delinquency, but because the defendant agreed to go with them, they did not show it or mention it to the defendant. *Id.* at 555. The officers did not tell the defendant why they wanted to speak with her. *Id.* at 554. At the barracks, the defendant was placed in an interrogation room and asked whether she knew why the officers wanted to speak with her. *Id.* at 555. The defendant responded affirmatively and executed a *Miranda* wavier.

The police immediately began to question the defendant about her son's death, to which she quickly confessed. *Id.* On appeal following her conviction for her son's

---

(…continued)
presented during the suppression phase of these proceedings, and so we may not consider it in our review of this suppression issue. *See, e.g.*, *In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013) (holding that this Court's scope of review for suppression rulings is limited to the record developed at the suppression hearing).

murder, the defendant argued that her *Miranda* waiver was not knowing and voluntary because she believed that the police appeared at her house because of her failure to make restitution payments. *Id.* This Court agreed, concluding that the circumstances exhibited that a "palpable ambiguity" existed as to the defendant's understanding of why she was being questioned. *Id.* at 557. Because the interrogating police officers took no measures to dispel the ambiguity before obtaining her waiver, the defendant's waiver could not be deemed to have been knowingly and intelligently made. *Id.*

It is Johnson's position that, just like the defendant in *Dixon*, he knew that there were outstanding arrest warrants for him on summary citations. Johnson's Brief at 28. He also points out that he was apprehended in a vehicle that was not his, thus creating another ambiguity as to the topic of the interrogation. *Id.* at 29. Johnson's arguments, however, entirely ignore all of the other above-reviewed information he possessed at the time of his arrest and interrogation. In *Dixon*, the ambiguity stemmed, in large part, from a magistrate's explicit warning that the defendant would be arrested if she did not comply with the terms of the restitution order (and her knowledge that she had not made any payments). *Dixon*, 379 A.2d at 557. Here, in significant contrast, Johnson's knowledge of relevant events at the time of his arrest and interrogation do not support a finding of any such ambiguity.

For his second suppression issue, Johnson claims that no probable cause existed to support the issuance of a warrant for samples of his DNA. Johnson's Brief at 31. Generally, to be valid, a search warrant must be issued by a neutral and detached magistrate and supported by probable cause. U.S. Const. amend. IV; Pa. Const. art. 1 § 8; *Commonwealth v. Lyons*, 79 A.3d 1053, 1063–64 (Pa. 2013). Probable cause exists where the totality of the circumstances set forth in the affidavit provide a fair probability that evidence of a crime will be found in a particular place. *Lyons*, 79 A.3d at

1064. The issuing magistrate must apply this "totality of the circumstances" test in a practical, common-sense, and not overly-technical, manner. *Commonwealth v. Johnson*, 42 A.3d 1017, 1031 (Pa. 2012). When a trial court reviews an issuing authority's decision to issue a search warrant, it must affirm unless there was no substantial basis for the issuing authority's decision. *Lyons*, 79 A.3d at 1064. In turn, on appeal, this Court will affirm the decision of the trial court unless we conclude that it committed an error of law or made a factual finding without record support. *Id.*

Here, the application for a search warrant and accompanying affidavit of probable cause were filed by Detective Fuhrmann at 1:33 a.m. on November 26, 2013, within hours of the end of the interrogation of Johnson. The warrant application sought, inter alia, DNA samples by means of oral swabbing, swabbing of both hands, fingernail scrapings from both hands, and hair samples.[13] Application for Search Warrant, 11/26/2013, at 1. In the affidavit of probable cause, Detective Fuhrmann detailed the fire in Apartment 604 and discovery of the bodies of Talley and R.R; the determination that Talley had multiple stab wounds, including some that looked to be defensive wounds; and the conclusion that the fire appeared suspicious in nature. Affidavit of Probable Cause, 11/26/2013, at 1-2. He stated that based on his training and experience, he was aware that "arson is sometimes used to destroy or conceal evidence of a crime." *Id.* at 2. Detective Fuhrmann stated that Nigeria Gary, a resident of the apartment complex, observed Talley's vehicle speed out of the parking lot approximately ten minutes before the fire was detected. *Id.* at 3. Detective Fuhrmann also explained that earlier that evening, Paulina Burke informed the police that Johnson

---

[13] Beyond this biological evidence, the warrant also sought to collect Johnson's clothing and to photograph his body. Application for Search Warrant, 11/26/2013, at 1. Johnson does not challenge the seizure of his clothes or photographs of his body.

was at the Levittown Trace Apartments, and as a result, the police found Johnson there, in possession of Talley's vehicle, the license plates on which had been changed. *Id.* at 2. Detective Fuhrmann further explained that in his interview with Johnson earlier that evening, Johnson admitted to being with Talley and R.R. just prior to their deaths and to taking the Cadillac from Avalon Court, and that he "gave conflicting accounts as to his possible involvement." *Id.* The detective also indicated that Johnson had a cut that appeared recent on the outside edge of one of his fingers. *Id.*

The magistrate issued the search warrant based on these sworn allegations. The trial court found the warrant sufficiently supported by probable cause, reasoning as follows:

> The probable cause affidavit … set forth the facts regarding the time and place of the fire, the death of [Talley] and R.R. and the stab wounds observed on the bodies. The affidavit also set forth facts regarding [Johnson's] connection with those events. [Johnson] admitted that he was in the apartment with the victims [on] the day of the fire. Within minutes of the fire being detected, [Johnson] fled the scene in a Cadillac at a high rate of speed, striking a parked car in the process. Within four hours of the fire, [Johnson] was stopped driving the Cadillac. At that time, the Cadillac displayed a license plate that did not belong to the vehicle. Just hours after the murders, police observed a cut on [Johnson's] hand. When he was questioned by the police as to his whereabouts at the time of the murders, [Johnson] gave conflicting accounts. [Johnson's] presence at the scene both before and after the fire started, his hasty flight from the scene in the apartment owner's car, his inconsistent statements to police and the injury to his hand provided sufficient circumstances, when viewed in a practical, common sense and realistic fashion, for the issuing authority to conclude that there was a fair probability that evidence of a crime would be found on [Johnson's] person. The motion to suppress … for failure to set forth probable cause was, therefore, properly denied.

Trial Court Opinion, 3/23/2016, at 20-21.

Based upon our standard of review, we find no error in the trial court's ruling. The trial court's findings are grounded in the affidavit's allegations and the trial court applied the proper legal standard, as it considered whether the allegations established a fair probability that evidence that could tie Johnson to these crimes could be found through his DNA.

Johnson complains that while the allegations might establish that he was present at Talley's apartment and then fled, neither of these facts by themselves establishes probable cause for a warrant related to his involvement in the murders. Johnson's Brief at 34-35. To begin, Johnson's argument ignores many of the other substantive allegations set forth in the affidavit of probable cause, such as that he was found in possession of Talley's vehicle; the change of license plates; the cut on his hand and Talley's defensive wounds; and the inconsistent nature of his answers to police questions. Moreover, allegations amounting to probable cause need not be considered in isolation; rather, a probable cause determination is based on the totality of the circumstances. *Lyons*, 79 A.3d at 1064. Consideration of these facts, in addition to Johnson's admitted presence in Talley's home immediately before the fire was detected (and his frenzied flight from the apartment), all coalesce to establish a sufficient basis for the issuance of the search warrant.

Johnson further claims that there was no basis for the issuance of a nighttime warrant. In addition to probable cause, an application for a warrant for a nighttime search must also show "some reason why the search cannot wait until morning." *Commonwealth. v. Bowmaster*, 101 A.3d 789, 794 (Pa. Super. 2014); *see also* Pa.R.Crim.P. 203(E) ("No search warrant shall authorize a nighttime search unless the affidavits show reasonable cause for such nighttime search."). This additional requirement is in recognition of the long-established doctrine that a nighttime intrusion

imposes a greater burden on a person's privacy interests.  *See* Pa.R.Crim.P. 203(E),

Cmt.  This enhanced burden on an individual's privacy, however, is not implicated when

the subject is in police custody.  *See Commonwealth v. Cross*, 496 A.2d 1144, 1149

(Pa. 1985) (finding a challenge to issuance of nighttime warrant failed because

appellant was in custody); *Commonwealth v. Berkheimer*, 57 A.3d 171, 179 n.10 (Pa.

Super. 2014) (same).  Furthermore, with regard to a nighttime warrant for the collection

of biological evidence, this Court has held that where a defendant has been lawfully

arrested and is in police custody, the seizure of hair samples and fingernail scrapings is

"so minor an imposition as to constitute only the slightest intrusion, if indeed such

constituted an intrusion," especially in light of the fact that "the hair and fingernails could

easily have been washed and brushed clean of any traces of relevant evidence."

*Cross*, 496 A.2d at 1150.

We face a similar scenario here.  In addition to Johnson being in police custody,

the transient nature of the evidence sought to be collected supports the trial court's

determination.  The trial court fairly concluded that the requisite reasonable cause for a

nighttime warrant existed because "[i]nvestigators were searching for trace evidence on

[Johnson's] person, evidence that is easily lost by the simple act of washing or the mere

passage of time."  Trial Court Opinion, 3/23/2016, at 21.  For these reasons, we find no

trial court error on this issue.

### III.  Prior Bad Acts

Johnson challenges the trial court's decision to introduce evidence relating to his

drug dealing partnership trade with Talley pursuant to Rule 404(b) of the Pennsylvania

Rule of Evidence.[14]  This evidence included the empty, clear Ziploc baggies found on

---

[14]   We review these claims mindful that the admission of evidence is within the
discretion of the trial court, and we will not disturb its rulings absent an abuse of
discretion.  *Commonwealth v. Weiss*, 776 A.2d 958, 967 (Pa. 2001).

his person at the time of his arrest as well as the bags of heroin retrieved by Johnson's brother, Marquis, at Johnson's request from the Levittown Trace Apartments laundry room. Johnson's Brief at 44, 46. The bags retrieved from Levittown Trace Apartments were stamped "#1 way to go" and were identical to bags found in Talley's car (used by Johnson when hastily leaving Talley's apartment), and scattered around Talley's head at the murder scene. *Id.* at 46. The trial court also permitted the introduction of statements made by Johnson to Marquis in which he admitted to selling drugs with Talley. *Id.* Finally, the trial court allowed the introduction of various electronic evidence of Johnson's drug sales conducted with Talley, including text messages between them and a videotaped drug buy executed by a confidential informant in Talley's apartment. *Id.* at 44, 46.

The trial court rejected Johnson's contention that this evidence of prior drug dealing activities was inadmissible under Rule 404(b)(1) of the Pennsylvania Rule of Evidence, which prohibits the use of evidence of "a crime, wrong, or other act … to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). The trial court ruled that the evidence was admissible under one or more of the exceptions to Rule 404(b)(1) in order to prove "motive, opportunity, intent, preparation, plan, knowledge and identity." Trial Court Opinion, 3/23/2015, at 25 (citing Pa.R.E. 404(b)(2)). On appeal, Johnson argues that no exceptions in Rule 404(b)(2) apply in these circumstances because there was no logical connection between the admitted evidence and the murders. Johnson's Brief at 52. Johnson argues that there was no actual proof as to when the heroin bags were hidden in the laundry room or that they were stolen from Talley's apartment. *Id.*

In its written opinion, the trial court presents a general statement of the decisional law relating to Rule 404(b), including citation to appellate decisions applying various of

the Rule 404(b)(2) exceptions in specific factual scenarios. Trial Court Opinion, 3/23/2015, at 24-26. In ruling that the disputed evidence was admissible under one or more of these exceptions, however, the trial court did not conduct a principled analysis of any of the Rule 404(b)(2) exceptions. For example, while the trial court ruled that the evidence was admissible to prove "identity," it failed to acknowledge that the "identity" exception under Rule 404(b)(2) requires proof that the bad acts and the crime on trial share "an almost uncanny similarity in all the details," *Commonwealth v. Wable*, 114 A.2d 334, 337 (Pa. 1955), and be "so nearly identical in method as to earmark them as the handiwork of the accused … like a signature." *Commonwealth v. Rush*, 646 A.2d 557, 560-61 (Pa. 1994) (quoting McCormick, Evidence, § 190 (1972 2d ed.); *Commonwealth v. Bryant*, 530 A.2d 83, 86 (Pa. 1987). Of course, Johnson's prior drug selling activities with Talley were plainly not "signature crimes" at all vis-a-vis his alleged crimes on November 25, 2013 (e.g., arson and murder). These were not "signature crimes."

Instead of attempting to analyze whether the contested evidence fit into one of the Rule 404(b)(2) exceptions, the trial court focused on whether it was admissible circumstantial evidence that Johnson committed the crimes with which he was charged. In connection with its "identity" analysis, the trial court determined that "heroin was inextricably intertwined with the murders of [Talley] and her children and the fires that were set inside their apartment." Trial Court Opinion, 3/23/2015, at 25. Reviewing the challenged evidence, the trial court then concluded that it demonstrated that Johnson "was the individual who took the heroin, killed the victims and then lit two fires, making the death of the victims and the destruction of the evidence certain." *Id.* at 25-26. On appeal, the Commonwealth likewise insists that the evidence in question was admissible, but not because it was propensity evidence allowable under a Rule

404(b)(2) exception. Instead, the Commonwealth argues that the evidence was circumstantial proof that Johnson committed the crimes with which he was charged, as it was "inextricably linked with the murder of Ms. Talley and the fire set inside her apartment." Commonwealth's Brief at 45.

Despite the lack of a cogent argument to support the trial court's decision to permit the introduction of the evidence, we nonetheless conclude that there was no error in admitting the evidence pursuant to Rule 404(b), although we do so for reasons other than those relied upon by the trial court.[15] To begin, Rule 404(b)(2) sets forth nine exceptions to Rule 404(b)(1)'s prohibition against the use of propensity evidence.[16] The official Comment to Rule 404 explains that this list of exceptions is non-exhaustive. Pa.R.E. 404, Comment. As such, courts are not restricted to the nine exceptions expressly listed in Rule 404(b)(2) when exercising their discretion to permit the admission of evidence of prior crimes, wrongs and acts, so long as the evidence is used for purposes other than to prove character or a propensity to act in accordance with traits of character.

Although not specifically referencing Rule 404(b), this Court identified one such additional exception in our decision in *Commonwealth v. Stanley*, 446 A.2d 583 (Pa. 1982). In *Stanley*, the appellant objected to the introduction of evidence to prove his prior first-degree murder conviction while on trial for a violation of 18 Pa.C.S. § 6105, which prohibits an individual convicted of a "crime of violence" from possessing

---

[15] "We may affirm a trial court's evidentiary ruling if we deem it to have been correct on grounds other than those specified by the court itself, particularly where the additional reason is apparent from the record." *Commonwealth v. Edwards*, 903 A.2d 1139, 1157 n.19 (Pa. 2006).

[16] "Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Pa.R.E. 404(b)(2).

firearms. *Id.* at 588. The appellant argued that introduction of this evidence was prejudicial, particularly in light of his willingness to stipulate to the conviction. *Id.* The Commonwealth disagreed, arguing that section 6105 required proof of the commission of a separate prior crime, and that as a result it was entitled to introduce evidence of the separate prior crime in order to prove the crime presently at issue. *Id.* This Court agreed with the Commonwealth, ruling that "appellant's murder conviction was undisputedly material and relevant to proving that he committed a 'crime of violence.'" *Id.* As a result, it was "proper" evidence that the Commonwealth was entitled to use to prove its case. *Id.*

Accordingly, our decision in *Stanley* confirms that where proof of an offense with which a defendant is charged requires proof of another crime or wrong, evidence of the other crime or wrong is necessarily admissible.[17] In the present case, the Commonwealth charged Johnson with, inter alia, two counts of second-degree murder, alleging that the murders of Talley and R.R. were committed in the course of a robbery of Talley's heroin.[18] *See* N.T., 6/2/2015, at 165-66. As a result, the Commonwealth was entitled to introduce evidence that was relevant to, and probative of, Johnson's alleged robbery of Talley's heroin -- even if the introduction of that evidence disclosed Johnson's prior bad acts to the jury.

The evidence challenged by Johnson was in fact all directly relevant and admissible to prove that Johnson stole heroin from Talley during the course of events

---

[17] *See also* 1 Imwinkelried, *Uncharged Misconduct Evidence* § 2:11 (2005) (explaining that evidence of an uncharged act is admissible where "the proponent can characterize the act as part of a discrete event charged[;]" for instance, where "[t]he charge is robbery, but the predicate proving the force is the rape. … the prosecutor is entitled to prove the rape as an essential part of the charged event.").

[18] The jury acquitted Johnson of these charges.

leading to her murder and that of her daughter. Evidence of Johnson's collaborative drug selling activities **with Talley** (including his statements, the electronic evidence and the videotape) were all relevant and admissible to prove his knowledge of her heroin supply, including the quantities she possessed and where they were located in her apartment. The bags of heroin that Marquis recovered from Levittown Trace Apartments at Johnson's direction, in packaging identical to those found in Talley's apartment, were relevant and admissible to prove that Johnson had stolen these drugs from Talley.

Accordingly, although we do so for reasons other than those relied upon by the trial court, we conclude that there was no error in connection with the admission of this evidence. The evidence was relevant and admissible to prove that Johnson committed a robbery in connection with the murders of Talley and R.R., and was therefore admissible to prove the second-degree murder charges.

### IV. Statement to Marquis

Johnson next challenges the admission of certain testimony by his brother Marquis. Johnson's Brief at 55. Marquis testified that during a conversation with Johnson "no more than five days" before the murders, Johnson told him, "I'm willing to do anything to make a come up." N.T., 6/1/2015, at 63-64. Marquis further stated that his brother said that "anything" included his willingness to "shoot someone … or be involved with anything[.]" *Id.* at 64. Marquis indicated that he understood "make a come up," to refer to "coming up with income." *Id.* Over objections by Johnson that this testimony was not relevant and constituted impermissible "prior bad acts" evidence that did not fit within any of the exceptions provided in Rule 404(b)(2), the trial court disagreed, ruling that this testimony was admissible to "establish motive, identity, intent

and premeditation." Trial Court Opinion, 3/23/2016, at 27. Johnson raises the same objections here.

Rule 404(b) has no applicability in this context. On prior occasions, this Court has ruled that extrajudicial statements relating to a specific "crime, wrong or act" may be admissible so long as they do not constitute impermissible hearsay. *See, e.g., Commonwealth v. May,* 887 A.2d 750, 762 (Pa. 2005); *Commonwealth. v. Simmons*, 662 A.2d 621, 635 (Pa. 1995). Here, however, Marquis' testimony regarding Johnson's alleged statements were not evidence of any particular "crime, wrong or act" by Johnson. Rather, they constituted mere statements of his desire to make money (or, more generally, to attain success) and his willingness to do anything (even to kill) to accomplish this end.

As a result, Marquis' testimony was not inadmissible under Rule 404(b), as this rule was not implicated. Moreover, the trial court did not err in denying Johnson's relevance objection, as the testimony was clearly relevant evidence. Rule 401 of the Pennsylvania Rules of Evidence provides a broad definition of relevant evidence, as evidence is relevant if it "logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Hawk*, 709 A.2d 373, 376 (Pa. 1998) (quoting *Commonwealth v. Spiewak*, 617 A.2d 696, 699 (Pa. 1992)). Even evidence that merely advances an inference of a material fact may be admissible. *Id.* Marquis' testimony describing Johnson's alleged statements is an example of such an inference, as one of the Commonwealth's theories at trial was that Johnson's expression of his intention to "make a come up" provided him with a motive to kill Talley and steal her heroin supply. *See* N.T., 9/16/2014, at 91-92; N.T., 6/2/2015, at 108-09.

Importantly, Johnson did not assert at trial or present here on appeal, any hearsay objections to Marquis' testimony about his (Johnson's) extrajudicial statements. Accordingly, whether this testimony constituted inadmissible hearsay or, conversely, satisfied one or more exceptions to the hearsay rule, is not before this Court.

### V. Unconstitutional Limitation of Mitigating Evidence

Section 9711(e) enumerates eight mitigating circumstances for which a defendant may present evidence during the penalty phase of a capital prosecution. *See* 42 Pa.C.S. § 9711(e). Section 9711(e)(8), sometimes referred to as the "catchall" mitigator, permits a capital defendant to present evidence "concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8). Under section 9711(e)(8), Johnson sought to have his mitigation expert, Carol Krych,[19] testify to "a multi-generational history of … continuous abusive, neglectful behavior," as well as chronic poverty, drug abuse and mental illness suffered by Johnson's grandparents, parents, and aunts and uncles. Johnson's Brief at 62.[20] Johnson sought to introduce such evidence in support of his "concept" that due to the pervasiveness of abuse in his extended family's history, abusive and criminal behavior had become normalized and "he … never had a chance to get out of this environment[.]" N.T., 6/5/2015, at 19.

---

[19] Ms. Krych described herself as "a capital mediation specialist, as well as a licensed alcohol and drug counselor" and "also a private investigator." N.T.,6/5/2015, at 5.

[20] Johnson identifies the following areas of Ms. Krych's testimony as wrongfully excluded: allegations of abuse; neglect or drug abuse spanning three generations of Johnson's family (as substantiated by court or agency records); the lack of "consistent supportive resources" throughout the large family due to "poverty, extreme dysfunction and arrests;" multi-generational reports of mental health issues, sibling and parental animosity, corporal punishment; and involvement with the criminal justice system. Johnson's Brief at 66.

The trial court limited the admission of this evidence.[21]  Drawing a boundary, the trial court reasoned that testimony regarding "any event in a relative's life that was somehow made part of the family structure or that was made known to [Johnson], and therefore could be said to have had an impact upon him, would be relevant and admissible[,]"[22] but that "[e]vidence from generations past regarding events at which [Johnson] was not present or of which he had never been made aware is not relevant or material to the personal history or character of [Johnson]" and were therefore inadmissible.  Trial Court Opinion, 3/23/2016, at 36-38.  Heralding that the Eighth Amendment requires a jury to "consider and give full mitigating effect to any relevant mitigating evidence[,]" Johnson argues that the trial court's ruling was an unconstitutional infringement on his right to present mitigating evidence.  Johnson's Brief at 63.

It is unconstitutional for a court to bar the presentation of relevant mitigation evidence during the penalty phase of a capital trial.  *Commonwealth v. King*, 721 A.2d 763, 776 (Pa. 1998) (discussing *Lockett v. Ohio*, 438 U.S. 586 (1978)); *Saffle v. Parks*, 494 U.S. 484, 490 (1990); *Eddings v. Oklahoma*, 455 U.S. 104 (1982)).  This pronouncement only applies to mitigation evidence that is relevant.  *Commonwealth v. Hairston*, 84 A.3d 657, 674 (Pa. 2014) (providing that evidence of mitigating circumstances must satisfy the threshold requirements of being both relevant and admissible).  As a general matter, evidence is relevant if it has any tendency to make a

---

[21]  The admission of mitigation evidence is within the discretion of the trial court.  *See, e.g.*, *Commonwealth v. Hairston*, 84 A.3d 657, 674 (Pa. 2014).

[22]  It is noteworthy that the trial court permitted testimony regarding Johnson's mother's turbulent life not only prior to his birth, but also prior to her relationship with Johnson's father, as well as substantial testimony regarding the violent, dysfunctional and deeply unstable relationship that existed between Johnson's parents before he was born.  *See* N.T., 6/5/2015, at 27-45.

fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Pa.R.E. 401.

Johnson attempts to establish the relevance of the excluded evidence based upon a comment to the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 ("Guideline 10.7"). Johnson's Brief at 63-64. Guideline 10.7 provides that when developing mitigation evidence, defense counsel should seek records and information "concerning not only the client, but also his parents, grandparents, siblings, cousins and children" because "[a] multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." *Id.* at 64 (quoting Guideline 10.7, Cmt.). Based on this comment, Johnson declares that his evidence of three generations' worth of "trauma inducing bio-psycho-social risk factors" and agency intervention in the family should have been deemed relevant and admissible. *Id.* at 65.

Johnson argues that this Court has recognized this concept in two prior cases, *Commonwealth v. Spotz*, 896 A.2d 1191 (Pa. 2006), and *Commonwealth v. Williams*, 863 A.2d 505 (Pa. 2004). Johnson's Brief at 65. A review of these cases, however, indicates that this Court has never endorsed Guideline 10.7 as a basis for the admission of evidence in death penalty cases. In *Spotz*, we acknowledged only that Guideline 10.7 recognizes that defense counsel's duty to pursue mitigation evidence extends to investigating prior convictions that could be used as aggravating circumstances. *Spotz*, 896 A.2d at 1226. In *Williams*, Chief Justice Saylor cited to Guideline 10.7 (among other guidelines) for the same proposition in a dissent. *Williams*, 863 A.2d at 528

(Saylor, J., dissenting).  Notably, Chief Justice Saylor acknowledged that this Court "has not endorsed or adopted [the ABA Guidelines] on a wholesale basis." *Id.* at 527 n.6.

Beyond drawing our attention to *Spotz* and *Williams*, Johnson does not articulate a principled argument for the adoption of the comment to Guideline 10.7 as a reason for the admission of evidence.  On its face, the comment is merely a prescriptive for capital defense counsel's obligation to thoroughly investigate mitigation evidence.  It is, for lack of a better term, advice to defense counsel recommending potentially fertile sources of mitigation evidence.  It does not, as Johnson now contends, provide any substantive basis to establish a per se rule requiring the admissibility of every type of evidence referenced in the comment.  The comment does not address the issue Johnson raises here, specifically whether all evidence of a family history of abusive and neglectful behavior, poverty, drug abuse and mental illness -- suffered by Johnson's grandparents, parents, and aunts and uncles, and of which Johnson had no knowledge or familiarity -- is admissible even if he cannot establish that it had any material effect on his character, his record, or the circumstances of his offense.  *See* 42 Pa.C.S. § 9711(e)(8).

We cannot say that, in a future case, we might well find that the type of "family history" evidence that Johnson sought to offer into evidence is admissible.  Here, however, we hold that Johnson has failed to provide any persuasive argument or advocacy for this Court to adopt his position.

## VI.  Penalty Phase Jury Instruction and Verdict Slip

Johnson asked the trial court to address each discrete mitigating circumstance that he offered under section (e)(8) separately when instructing the jury and to list them

separately on the verdict slip.[23]  The trial court denied this request, but provided the following charge to the jury:

> The defense has alleged and presented evidence to support various mitigating circumstances.  They are also defined by statute, and I will go through those now. First, that the defendant has no significant history of prior criminal convictions.  Second, that the defendant was under the influence of extreme mental or emotional disturbance at the time of the killing.  Third, the age of the defendant at the time of the crime.  Specifically, the defense has offered by way of mitigating that the defendant was [twenty-one] years old at the time the crimes were committed.
>
> And fourth, this has been referred to as the catch-all, but it is actually more specific than that.  The fourth area of mitigation circumstances … alleged by the defense is any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.
>
> Now, under that mitigating circumstance[,] the defense has made a number of arguments regarding the character and record of the defendant and the circumstances of the offense.  They have argued that he has impaired neurological functioning.  They have argued lack of stability.  They have argued maternal neglect or general neglect.  They have argued maternal rejection.  They have argued physical abuse.  They have argued that the defendant lost his father.  They have argued that his family was involved in the criminal justice system in [sic] various criminal conduct. They have argued institutional failure.  They have argued the effect of multiple adverse childhood

_____

[23]  Johnson identifies the following discrete mitigating circumstances:  his history of mental illness for which he was not medicated at the time of the crimes; the physical/psychological trauma he has endured since childhood; impaired neurological functioning; lifelong neglect, verbal and physical abuse (including torture); the death of his father, the only person to whom Johnson felt attached, at age seven; his immediately family's severe dysfunction, including extensive involvement with the criminal justice system; institutional failure; the effect of chronic stress and multiple adverse childhood experiences, which created a high risk of developing maladaptive behaviors; and evidence that he "wanted to do well."  Johnson's Brief at 56-57.

experiences on the defendant. They have argued that he suffers from mental illness and was not medicated at the time of the crime. They have argued that the defendant desires to do well in his life and that there are other circumstances you may consider.

All of those arguments, all of those arguments relate to the mitigating circumstance number four. That is one mitigating circumstance. But you may consider all of those facts in support of that mitigating circumstance.

I want to be clear. One, what I have just listed for you is not an exhaustive list of what the defendant argued under that mitigating circumstance. It will be for you to recall everything that Mr. Fioravanti has presented and argued to you that would support that mitigating circumstance. I also want to be very clear that neither I nor Mr. Fioravanti -- my instructions or Mr. Fioravanti's arguments should limit you in terms of what you can find as a mitigating circumstance or mitigating evidence under that catch-all mitigating circumstance. Any other mitigating factor relating to the character and record of the defendant and circumstances of his offense may be -- should be considered by you. There is no limit to the mitigation that you may find under this factor so long as it arises from the evidence.

N.T., 6/8/2015, at 201-04.

Johnson argues that the United States and Pennsylvania Constitutions requires a jury to consider all mitigating factors, and that grouping all non-statutorily defined mitigating evidence under one category creates the risk that the jury will not give the evidence of each non-statutory mitigating factor separate and equal consideration. Johnson's Brief at 58-60. Johnson contends that the failure to address each factor individually in the jury instruction and to include each mitigating circumstance separately on the verdict slip could have led the jury to "discount" their importance during deliberations. *Id.* at 58-61.

This Court recently rejected the argument that Johnson now advances. The defendant in *Commonwealth v. Mattison*, 82 A.3d 386 (Pa. 2013), asked the trial court to charge the jury separately on each of the seven claims of mitigating evidence that he

presented under section 9711(e)(8) and for the verdict slip to reflect them separately. The trial court declined to do so, instead instructing the jury that it could find as a mitigating factor "any evidence of mitigation concerning the character and record of the [d]efendant and the circumstances of [d]efendant's offense." *Id.* at 398. On appeal, the defendant argued that the trial court's refusal to give his requested instruction caused the jury to give less consideration to the evidence he presented of non-statutory mitigation factors. *Id.* at 399. Rejecting the argument, this Court explained that there is no authority or sound legal basis for requiring a trial court to enumerate, either in jury instructions or on verdict slips, every discrete category of catch all mitigation evidence presented. *Id.* at 400.

The defendant in *Mattison* candidly admitted that no Pennsylvania statute or case law supported his argument, and he instead directed us to federal cases prohibiting state courts from restricting a capital defendant's presentation of relevant mitigating evidence. *Id.* at 399 (citing *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978)). This Court reasoned, however, that the defendant's claim confused the distinction between **allowing** a jury to consider mitigating evidence and **guiding** its consideration of the mitigating evidence. *Id.* at 400. The federal cases at issue involved instances in which the trial court either restricted the type of mitigation evidence presented or advised the jury to ignore non-statutory mitigation evidence. *Id.* at 399-400. We concluded that where a trial court allows the contested, non-statutory mitigation evidence to go to the jury and guides its consideration by instructing the jury in conformance with the language of section 9711(e)(8), there is no error in the trial court's instruction. *Id.* at 400 (discussing *Commonwealth v. King*, 721 A.2d 763, 777 (Pa. 1998)).

Our decision in *Mattison* disposes of Johnson's claim.[24]   When a defendant presents mitigation evidence under section 9711(e)(8), the trial court must instruct the jurors only in conformance with the language of section 9711(e)(8).  A trial court is not required to instruct the jury as to each theory of mitigation raised under the broad banner of section 9711(e)(8), and the verdict slip is not required to reflect each such theory separately.[25]

### VII.  Denial of Motion to Bar Death Penalty Due to Nature of Crimes

Johnson argues that the Commonwealth should not have been permitted to pursue the death penalty because the "nature and brutality" of the crimes would overwhelm the jury and negate its ability to impartially consider the mitigation evidence he put forth, thereby violating his constitutional right to have the jury "consider and give effect to all mitigating evidence."  Johnson's Brief at 72-73.[26]  Johnson asserts that the death penalty is intended for only the worst offenders and the very worst crimes, and argues that the jury here was predisposed to place him in that unenviable category because of the nature of the crimes.  *Id.* at 69-73.

---

[24]   Johnson acknowledges *Mattison* but does not discuss it except to concede that this Court rejected the argument he presently advances therein.  Johnson's Brief at 56 n.6.

[25]   The trial court's instruction as reproduced above did identify many of the specific claims of mitigation that Johnson raised under section 9711(e)(8).  This jury instruction therefore went well beyond the instruction the trial court was required to give, and was far more detailed than the instruction in *Mattison*.

[26]   In his discussion of this issue, Johnson also argues for a "categorical ban" on the death penalty based upon various United States Supreme Court decisions that hold certain categories of offenders may not be subjected to the death penalty.  Johnson's Brief at 72-73, 78 (discussing *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002)).  Johnson did not raise this issue before the trial court or in his statement of matters complained of on appeal; as such, it is waived.  *Hairston*, 84 A.3d at 672 (finding issue waived in capital case where defendant failed to include it in his statement of matters complained of on appeal); *Freeman*, 827 A.2d at 402.

The trial court found this argument meritless, reasoning that "the ultimate question with regard to this claim is whether the jurors would be able to put aside any bias, sympathy, prejudice or emotion" and decide the case based upon the evidence and the jury instructions. Concluding that voir dire revealed that a "fair and impartial" jury was seated, that it repeatedly instructed the jury "to make a dispassionate evaluation of the evidence[,]" and that the jury found that mitigating factors outweighed aggravating factors with regard to Talley's murder (but not R.R.'s murder), the trial court determined that the jury properly considered the mitigating evidence. Trial Court Opinion, 3/23/2016, at 35-36.

We agree that there is no merit to this claim. Johnson's argument is that the Commonwealth should not have been permitted to pursue the death penalty because the particularly brutal nature of his crimes would blind the jury to its duty to consider and weigh mitigation evidence. Taken to its logical conclusion, Johnson's position would result in the anomalous situation in which the more heinous the crime, the less likely that its perpetrator would be eligible for the death penalty because of the overmastering influence the circumstances could have on the jury's impartiality. Criminals who commit the most egregious crimes would be effectively exempt from the death penalty, when the death penalty has been reserved for precisely such crimes. *See Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) ("[C]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution."). This would be a bizarre and irrational outcome, and we do not endorse it.[27]

---

[27] The jury did find multiple mitigating factors as to both murders. *See* Talley Sentencing Verdict Slip, 6/18/2015, at 3-4; R.R. Sentencing Verdict Slip, 6/18/2015, at 3. This is strong evidence that the jury was, in fact, able to consider and weigh the mitigating evidence.

### VIII.  Constitutionality of Aggravating Factors

In his final argument, Johnson alleges that three statutory aggravating factors the jury found in relation to the murder of R.R., sections 9711(d)(5), (11), and (16), are unconstitutionally vague and overbroad.  Johnson's Brief at 78.  To survive such a challenge, an aggravating circumstance must be found to "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Commonwealth v. Baumhammers*, 92 A.3d 708, 738 (Pa. 2014).  Johnson does not explain how the provisions he has challenged fail to meet this standard.  Instead, without discussing the three factors individually, he offers a blanket statement that these aggravating circumstances fail to adequately define what constitutes a circumstance that would fall under each of them, and therefore "fail to provide any meaningful basis for distinguishing those few cases in which the death penalty is imposed from the many cases in which it is not."  Johnson's Brief at 80.  We disagree.

Section 9711(d)(16) establishes as an aggravating factor the fact that the victim was a child under twelve years of age.  42 Pa.C.S. § 9711(d)(16).  This Court rejected a vagueness challenge to section 9711(16) in *Commonwealth v. Bardo*, 709 A.2d 871 (Pa. 1998), concluding that the provision "is abundantly clear and merely reflects the legislative judgment that killing a person under the age of twelve is a particularly heinous crime" and that "[i]f anything," it is a "model of clarity."  *Id.* at 878-79.  Johnson offers no persuasive basis on which to depart from our prior decision in *Bardo*.

We have similarly rejected two prior vagueness challenges to section 9711(d)(11), which provides as an aggravating factor the fact that where "[t]he defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue."  42 Pa.C.S. §

9711(d)(11).  In *Commonwealth v. Fletcher,* 861 A.2d 898 (Pa. 2004), we concluded that

> this aggravating circumstance clearly narrows the class of persons eligible for the death penalty by excluding those individuals who have not been convicted of another murder. Moreover, the "multiple murder" aggravator reasonably justifies the imposition of a more severe sentence because, based upon their risk of danger to general society, those individuals convicted of multiple murders warrant a harsher punishment.  As such, the "multiple murder" aggravator comports with the necessary requirements of the Eighth Amendment and the Due Process Clause.

*Commonwealth v. Fletcher,* 861 A.2d 898, 913 (Pa. 2004).  Relying on *Fletcher*, we reached the same result in *Baumhammers*.  *Baumhammers*, 92 A.3d at 737-38.  As with section 9711(d)(16), Johnson has failed to provide any principled reason for this Court to deviate from its prior decisions in *Fletcher* and *Baumhammers*.

Section 9711(d)(5) provides an aggravating circumstance where "[t]he victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses."  42 Pa.C.S. § 9711(d)(5).  As with sections 9711(d)(11) and 9711(d)(16), this provision includes a precisely tailored description of the criteria that must be met for the invocation of this aggravator. Moreover, the legislative intent for including this aggravator should be clear, namely that committing a subsequent crime (a murder) to avoid punishment for a prior crime merits a harsher sentence.  Johnson provides no refutation to these conclusions, and we will not construct an argument on his behalf.  *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("It is not the obligation of this Court, even in a capital case, to formulate [the] [a]ppellant's arguments for him.").[28]

---

[28] We note that Chief Justice Saylor, in a dissenting posture, has expressed his "continuing reservations" with this Court's interpretation of section 9711(d)(5) as (continued…)

## IX. Review of the Death Sentence
## Pursuant to 42 Pa.C.S. § 9711(h)

This Court is required to review every death sentence to ensure that it was not imposed as a result of passion, prejudice or any other arbitrary factor and that there is evidence to support the jury's finding of aggravating circumstances. 42 Pa.C.S. § 9711(h)(1), (3); *Commonwealth v. Harris*, 817 A.2d 1033, 1058 (Pa. 2002). The death penalty was imposed for the murder of R.R. The jury found as aggravating circumstances the fact that she was under the age of twelve, that she was a witness to her mother's murder and was killed to prevent her from identifying Johnson as her mother's killer, and that Johnson was convicted of committing another murder. Murder of the First Degree of [R.R.] Sentencing Verdict Slip, 8/16/2015, at 3. There is ample evidence to support the jury's finding of these aggravating factors, much of which has been detailed hereinabove.

The sound factual predicate for the aggravating factors bolsters a conclusion that the sentence was not the result of passion, prejudice or any other arbitrary factor. Indeed, the jury also found three mitigating circumstances,[29] but in its ultimate calculus decided that they were outweighed by the aggravating factors. The record reveals

---

(…continued)
applying to potential prosecution witnesses, indicating that, based on his reading of the provision, "a relevant prosecution [must] have preceded the killing." *Commonwealth v. Daniels*, 104 A.3d 267, 321 & 322 n.3 (Pa. 2014) (Saylor, J. dissenting). Johnson has not raised that issue in this appeal. Notably, moreover, for purposes of our statutory review, the jury found other aggravating circumstances; as such, consideration of this particular question is presently unnecessary. 42 Pa.C.S. §9711(h)(3)(ii) ("The Supreme Court shall affirm the sentence of death unless it determines that . . . the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).").

[29] These were Johnson's age, his lack of prior convictions, and "catch all [sic] [] mitigation concerning [his] character. Murder of the First Degree of [R.R.] Sentencing Verdict Slip, 8/16/2015, at 3.

nothing but a measured and sober deliberation. Accordingly, we must affirm the sentence of death. 42 Pa.C.S. § 9711(h)(3).

**Conclusion**

Having found no reversible error, we affirm Johnson's convictions and judgment of sentence. The Prothonotary is hereby directed to transmit to the Governor the complete records of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court of Pennsylvania, pursuant to 42 Pa.C.S. § 9711(i).

Chief Justice Saylor and Justices Baer, Todd, Dougherty and Wecht join the opinion, and Justice Mundy joins the majority except for Part III where she concurs in the result.