J-S16015-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TERRANCE XAVIER PEREZ | : | |
| | : | |
| Appellant | : | No. 486 MDA 2017 |
| | : | |

Appeal from the Judgment of Sentence November 1, 2016
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s):  CP-41-CR-0001046-2015

BEFORE:   BOWES, J., MURRAY, J., and PLATT*, J.

MEMORANDUM BY BOWES, J.:                           **FILED NOVEMBER 29, 2018**

Terrence Xavier Perez appeals from the judgment of sentence of life imprisonment followed by twenty-five to fifty years incarceration imposed after he was convicted of first-degree murder, criminal conspiracy (homicide), persons not to possess firearms, and related offenses.  We affirm.

On May 11, 2015, a altercation occurred between Rory Herbert and Jamil Bryant ("the victim") due to Herbert's belief that the victim had "shorted" him on a marijuana purchase.  N.T. Trial, 10/24/16, at 78.  Herbert recounted the event to his cousin, Brandon Love, who was a friend of Appellant and the victim.  Thereafter, Herbert, Love, and Appellant went to the home of Cosme Berrones.  *Id*. at 137.  Also present were Berrones' girlfriend, Brooke Dawson, and Jada Jenkins, the mother of Love's child.  Love and Appellant spent the next several hours on Love's cell phone, texting and orally arguing with the

_____
*   Retired Senior Judge assigned to the Superior Court.

victim. *Id*. at 82-83. Berrones testified that the victim threatened to blow Love's head off and, in response, Appellant stated to the victim, "if you have a problem with [Love] then you have a problem with me, he's not the only one with a gun." *Id*. at 85. Thereafter, Appellant and Love left Berrones's home and, when they returned, Appellant had a silver revolver. *Id*. Appellant asked Love and Ms. Jenkins to take him to get bullets for the firearm, but they declined. *Id*. at 86.

Appellant then started talking about shooting the victim. *Id*. at 88, 90. Appellant asked Love for a ride home, but Love refused. *Id*. at 87. Ultimately, Berrones used Love's vehicle to drive Appellant home, where Appellant, a state parolee, dropped off his electronic ankle monitor in order to establish a false alibi regarding his whereabouts in anticipation of later shooting the victim. *Id*. at 88. Appellant and Berrones returned to Berrones's home, where Appellant debated either getting ammunition for the silver revolver or a different gun for the purpose of killing the victim. *Id*. at 93-94. Appellant asked Love for a ride to get another gun, and Love refused. *Id*. at 94-95. Berrones thereafter drove Appellant to a storage facility for the purpose of retrieving another gun. *Id*. at 96. Appellant was met at the entrance to the storage facility by a man driving a silver van. *Id*. Appellant entered the silver van, after which he and the unidentified man drove through the gates of the storage facility. *Id*. at 96, 98. Approximately five minutes later, Appellant and the unidentified man reemerged from the storage facility in the silver van.

*Id*. 98-99. When Appellant re-entered Love's vehicle, he was carrying a long black assault rifle. *Id*. at 99. Berrones and Appellant returned to Berrones's home with the assault rifle, whereupon Appellant resumed talking about shooting the victim. *Id*. at 100-01.

Appellant then asked Love for a ride to the victim's house, and Love agreed. *Id*. at 102. Love then drove Appellant and Berrones to the victim's neighborhood, where they spent forty to forty-five minutes driving around looking for the victim. *Id*. at 103-04. Eventually, they saw the victim on his front porch, and Love and Berrones dropped off Appellant nearby. *Id*. at 105. Appellant was carrying the assault rifle when he exited the vehicle. *Id*. at 106. Love and Berrones proceeded to a pre-arranged pick-up location on Grant Street where they waited for Appellant. *Id*. at 106-07. Berrones heard what sounded like fire crackers before Appellant ran back to Love's car, and said that he "shot that pussy in his muffin."[1] *Id*. at 107-08. Appellant warned Love and Berrones, "[y]ou pussies better not say anything." *Id*. at 109.

Upon return to Berrones's home, Appellant, still in possession of the assault rifle, went to the basement, and re-emerged without the weapon. *Id*. at 109-10. At the time of the shooting, Appellant was wearing a black hoodie, red shirt, black shorts, and red shoes. *Id*. at 111. Appellant asked Berrones for a change of clothes, and Berrones gave him a black shirt and khaki pants,

---

[1] Berrones testified that "muffin" means "head," and that Appellant was indicating that he shot the victim in the head. N.T. Trial, 10/24/16 at 108-09.

- 3 -

along with a backpack in which to store the clothes he had been wearing when he shot the victim. *Id*. at 113. As Appellant left Berrones's home, Berrones heard him say "let me know when that pussy dies, I'll feel better at night." *Id*.

Shortly thereafter, Berrones found the assault rifle in the rafters of his basement. *Id*. at 113-14. Berrones took the assault rifle and moved it to a porthole in his basement. *Id*. at 114. Berrones later consented to a search of his home, and led police to the weapon. *Id*. Berrones was shown a photograph of the recovered assault rifle, and confirmed that it was the weapon that Appellant used to shoot the victim. *Id*. at 100.

The victim's neighbor, Carla Johns, testified that, on the evening of the murder, she saw a man wearing black shorts and a black hoodie running down the street with a large, black assault rifle. N.T. Trial, 10/25/16, at 47-48. A few minutes later, she heard shots fired. *Id*. Ms. Johns was shown a photograph of the assault rifle recovered from Berrones's basement, and indicated that it was similar to the weapon that the man was carrying. *Id*. at 48.

Another neighbor of the victim, Shannon Welch, testified that he was standing outside his home on the evening of the murder and heard several shots fired. *Id*. at 55-57. He then saw a man wearing shorts running toward Grant Street. *Id*. at 58-59.

Mary Lopez, who lived near the victim, testified that, when she came home from work on the evening of the murder, the victim was standing across the street between two cars. N.T. Trial, 10/31/16, at 67. She heard gunshots a few minutes later, and when she looked out her window, she saw the victim on the ground in the middle of the street. *Id*. at 69. Several minutes after the shooting, she saw the shadow of two individuals walking past the front of her house and heard their voices. *Id*. She stated "It sounded like male voices, but I don't know where they were from, they didn't seem like they were running, . . . they were just kind of hurriedly . . . just walking away." *Id*. Ms. Lopez never saw the individuals, and could provide no description of them due to a heavy curtain hanging over the window. *Id*. at 72. She did not know whether the individuals were involved in the shooting, or were just passing through the neighborhood. *Id*.

Ms. Dawson testified that she was at Berrones's house on the day of the murder, and confirmed that Appellant, Love, and Berrones were arguing with the victim all day over the phone. N.T. Trial, 10/25/16, at 8, 12. She recalled that Appellant left Berrones's home a few times; once returning with a silver revolver, and later returning with a big, black gun. *Id*. at 13-17. Ms. Dawson was shown a photograph of the assault rifle recovered from Berrones' basement, and confirmed that it was one of the weapons that Appellant brought back to Berrones's home. *Id*. at 17. That evening, she saw Appellant, Love, and Berrones leave Berrones's house, and, as they were leaving, she

heard Appellant say "let's do this." *Id*. at 18. When the three men returned, Appellant stated that he "shot him 16 times." *Id*. at 20. Ms. Dawson testified that Appellant was wearing black shorts, a red shirt and red shoes. *Id*. at 20-21. She recalled that he then changed into khaki pants and a black shirt that Berrones provided to him. *Id*. at 21.

Ms. Jenkins testified that she was at Berrones' house on the day of the murder, and confirmed that Appellant, Love, and Berrones were arguing with the victim over the phone. N.T. Trial, 10/26/16, at 5-6. She left Berrones' house for a few hours, and when she returned, the argument had become intense and serious. *Id*. at 6. Love told Ms. Jenkins that the victim had threatened to shoot both Love and Ms. Jenkins. *Id*. at 7. She testified that Appellant threatened to shoot the victim, and that he had a silver revolver with him at the time he made the threat. *Id*. at 8. Appellant did not have any bullets for the silver revolver, and he asked Ms. Jenkins to take him to purchase bullets, but she declined. *Id*. at 8-9. At some point, Appellant and Berrones left Berrones' home, and when they returned, Appellant had a large black gun. *Id*. at 9. Ms. Jenkins identified the large black gun as the one pictured in a photograph of the assault rifle recovered from Berrones's basement. *Id*. at 10. She thereafter saw Appellant, Love, and Berrones leave Berrones's house, and, as they were leaving, she heard Appellant state "let's do this." *Id*. at 10-11. Appellant was carrying the assault rifle when they left. *Id*. at 11. Ms. Jenkins saw Appellant get into the back seat of Love's

vehicle with the assault rifle. *Id*. at 12. When they returned approximately one hour later, Appellant still had the assault rifle. *Id*. Ms. Jenkins observed Appellant go into Berrones' basement with the assault rifle, but when he emerged, he did not have the gun with him. *Id*. at 13-14. Ms. Jenkins recalled that Appellant was wearing a black hoodie, but then changed into clothes provided by Berrones, and put the clothes he took off into a black drawstring bag. *Id*. at 14. Appellant thereafter left Berrones's home, and as he was departing, Ms. Jenkins heard him exclaim "let me know when that pussy dies." *Id*. at 15.

Chris Hayman testified that, on the day of the murder, Appellant asked him for a ride to the storage facility. N.T. Trial, 10/25/16, at 91. Hayman declined, but agreed to meet Appellant there. *Id*. Hayman drove his silver van to the entrance of the storage facility, and Appellant arrived shortly thereafter as a passenger in a vehicle. *Id*. at 92-93. Appellant exited the vehicle and got into Hayman's van, and they drove through the facility's security gates. *Id*. at 94. Hayman had the passcode to the storage facility and the key to the storage unit. *Id*. at 94-95. When they arrived at the storage unit, Hayman unlocked the unit for Appellant, and returned to his van. *Id*. at 95. Hayman testified that when Appellant emerged from the storage unit, he had an AR or AK rifle with him. *Id*. at 96. Hayman was shown a photograph of the assault rifle recovered from Berrones's basement, and he

identified it as the weapon that Appellant retrieved from the storage unit. *Id*. at 97.

Detective Stephen Sorage testified that a search warrant was executed on the storage unit, wherein police found a large black canvas duffel bag which contained a backpack, 356 rounds for a .22 caliber Winchester, an owner's manual for a Smith and Wesson 15-22 assault rifle (the same model as the assault rifle recovered from Berrones's basement), a .32 revolver, a white towel, and cologne. N.T. Trial, 10/25/16, at 64-68; 10/28/16, at 93.

Appellant's mother, Sabina Kent, was shown a photograph of the assault rifle recovered from Berrones's basement, and identified it as belonging to Appellant. N.T. Trial, 10/27/16, at 4. She had last seen the assault rifle one week before the murder in the home she shared with Appellant. *Id*. She explained that the assault rifle was in a black bag, which also contained bullets, a towel, cologne, and a book bag. *Id*. at 6. Ms. Kent was shown photographs of the black canvas bag and its contents, as recovered from the storage unit, and she identified the canvas bag, the book bag, the towel, and the cologne as those she had seen in her home one week before the murder, and as belonging to Appellant. *Id*. at 6-8. Ms. Kent testified that Appellant removed the black canvas bag from their home on the morning of the murder. *Id*. at 9.

Agent Raymond Kontz testified that on May 14, 2015, he obtained a warrant for Appellant's arrest. N.T. Trial, 10/28/16, at 95-96. Appellant was

apprehended on May 29, 2015, by police in South Carolina. *Id*. at 96. Agent Kontz and Detective Sorage drove to the correctional facility where Appellant was being detained, and conducted a recorded interview of Appellant over a three-hour period. *Id*. at 97-98. During the interview, Appellant provided multiple versions of the events of the day of the murder. N.T. Trial, 10/31/16, at 5. He first told police that he was visiting family in Philadelphia. *Id*. at 6. Next he told police that Love and Berrones dropped him off at an apartment complex one hour prior to the murder. *Id*. He thereafter told police that Berrones was the shooter. *Id*. at 7, 24-26.

Dr. Barbara Bolllinger, a forensic pathologist, testified that an autopsy of the victim showed multiple gunshot wounds to his head, torso, chest, abdomen, neck, left hand, and right hand. N.T. Trial, 10/26/16, at 50.

Corporal Elwood Spencer, a firearms expert, testified that all seventeen of the cartridge cases recovered from the crime scene were discharged from the assault rifle recovered from Berrones' basement. N.T. Trial, 10/28/16, at 64. He also testified that the ammunition recovered from the storage unit was consistent with the discharged bullets and the casings found at the crime scene. *Id*. at 58-61.

Lauren Force, a DNA expert testified that Appellant's DNA was a major contributor to the DNA found on the magazine of the assault rifle recovered from Berrones' home. N.T. Trial, 10/28/16, at 76. She further testified that

DNA testing indicated that Berrones could not be included as a contributor to the DNA obtained from the evidence found in the case.[2] *Id*. at 78.

Appellant was charged with criminal homicide, criminal conspiracy (homicide), persons not to possess firearms, and related offenses for the victim's murder.[3] The persons not to possess firearms charge was severed before trial. On November 1, 2016, a jury found Appellant guilty of first-degree murder, criminal conspiracy (homicide), and related charges. Thereafter, the trial court found Appellant guilty of persons not to possess firearms. On November 1, 2016, the trial court sentenced Appellant to a term of life imprisonment on the first-degree murder conviction, followed by a consecutive term of twenty to forty years incarceration for the criminal conspiracy (homicide) conviction, and a consecutive term of five to ten years incarceration for the persons not to possess firearms conviction. Appellant filed post-sentence motions which were denied by operation of law. This timely appeal followed.

---

[2] The Commonwealth and defense stipulated that, if called to testify, Catherine Palla would testify that DNA testing showed that Love and Herbert could not be included as contributors to the DNA profiles obtained from the evidence in the case. Trial Court Opinion, 6/27/17, at 15.

[3] Co-defendant Berrones pled guilty to third-degree murder and other offenses prior to Appellant's trial. A joint trial was scheduled for Appellant and Love; however, at jury selection, co-defendant Love's criminal case was severed and continued until after Appellant's trial. Neither Appellant nor Love testified at Appellant's trial.

Appellant raises the following issues for our review:

I.    Did the trial court err by permitting Agent Kontz to testify, over defense objection[,] that after having involved several police agencies in the investigation, interviewed more than 50 witnesses[,] and logged 344 pieces of evidence, no evidence pointed to any person other than [Appellant] as being the trigger person?

II.   Did the trial court err by not requiring the Commonwealth to redact portions of [Appellant's] statement where the officers confronted him with statements of a co[-]conspirator who did not testify and was not joined for trial?

III.  Did the trial court erred [sic] by permitting the Commonwealth to completely reiterate . . . Berrones'[s] trial testimony through use of prior consistent statements elicited at the preliminary hearing?

IV.   Did [the] trial court err by permitting the Commonwealth to admit a phone call from [Appellant] to his step-mother[,] while he was incarcerated[,] . . . where she said "Well I hope you learned your lesson.  You always wipe your shit off;" the [Appellant] responded: "I been doing that."

V.    Did the trial court err by permitting the Commonwealth to introduce at trial portions of letters that [Appellant] wrote to his girlfriend, Kirsten Sedlock?

VI.   Did the trial court err by refusing to permit [Appellant] to question the cooperating [c]o-defendant, . . . Berrones, about his plea negotiations, including that he rejected a 15 to 40 year agreement, and the Commonwealth thereafter agree [sic] to a 12 years minimum?

VII.  Did the trial court abuse its discretion by sentencing [Appellant] to 25 to [5]0 years[,] consecutive to the mandatory life sentence[,] for conspiracy and person not to possess a firearm?

Appellant's brief at 4.

Appellant's first six issues implicate the trial court's authority to admit or exclude evidence. Our standard of review concerning the admissibility of evidence is well settled:

> With regard to the admission of evidence, we give the trial court broad discretion, and we will only reverse a trial court's decision to admit or deny evidence on a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error in judgment, but an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of the record.

**Commonwealth v. Talbert**, 129 A.3d 536, 539 (Pa.Super. 2015) (citation omitted).

It is well-settled that "[r]elevance is the threshold for admissibility of evidence." **Commonwealth v. Tyson**, 119 A.3d 353, 358 (Pa.Super. 2015); **see also** Pa.R.E. 402. "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401; **see also Tyson**, **supra** at 358 (stating that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact."). "Evidence that is not relevant is not admissible." Pa.R.E. 402. In addition, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

- 12 -

In his first issue, Appellant contends that the trial court abused its discretion in overruling his objection, on the basis of relevancy, to a line of questioning during the Commonwealth's direct examination of Agent Kontz regarding the scale of the murder investigation. Agent Kontz was thereafter permitted to testify as to the number of police agencies, police officers, witnesses, and pieces of evidence encompassed by the investigation. The testimony in question proceeded as follows:

> [Prosecutor:] Agent Kontz, can you estimate for us the number of officers and police agencies that have been involved in the investigation of this case?
>
> [Agent Kontz:] Over two dozen officers and it would be dealing with agencies throughout our county, Williamsport, Old Lycoming Township, Penn College, Pennsylvania State Police[,] along with South Carolina, the officers down there.
>
> [Prosecutor:] As well as detectives in the District Attorney's Office?
>
> [Agent Kontz:] Yes sir, absolutely.
>
> [Prosecutor:] And can you estimate for us the number of witnesses that have been interviewed as part of the investigation in this case?
>
> [Agent Kontz:] I would estimate more than 50.
>
> [Prosecutor:] And can you estimate for us the number of pieces of individual evidence that have been collected in this case?
>
> [Agent Kontz:] According to our records management system, there is 344 pieces of evidence that was placed in under this particular incident.

N.T. Trial, 10/31/16, at 55-56.[4]

We believe the above testimony met the test for relevancy. In her opening statement, Appellant's counsel claimed that the Commonwealth had failed to prove Appellant's guilt, citing a "lack of evidence." N.T. Trial, 10/24/16, at 21. Thus, she called into question the quantity of the evidence in the case. As the lead investigator, Agent Kontz had personal knowledge of the murder investigation, including the number of police agencies and officers involved, witnesses interviewed, and pieces of evidence collected. Contrary to Appellant's argument, the agent's testimony was relevant to rebut Appellant's claim that there was a lack of evidence in the case, and to establish that the Commonwealth had undertaken a comprehensive murder investigation. *See* Pa.R.E. 401, 402. Therefore, we find no abuse of discretion in the admission of this portion of Agent Kontz's testimony.

Appellant claims that the trial court further erred by permitting Agent Kontz to testify, over objection based on an opinion going to the ultimate

---

[4] At trial, the sole basis for Appellant's objection to this portion of Agent Kontz's testimony was relevancy. *See* N.T. Trial, 10/31/16, at 54. We therefore decline to address the additional bases for objection that Appellant now raises for the first time on appeal. *See Commonwealth v. Baumhammers*, 960 A.2d 59, 73 (Pa. 2008) (holding that a failure to offer a timely and specific objection results in waiver of the claim."); *see also* Pa.R.E. 103(a) (providing that "[a] party may claim error in a ruling to admit . . . evidence only . . . if . . . a party, on the record . . . makes a timely objection . . . and . . . states the specific ground . . ."); Pa.R.A.P. 302(a) ("Issues that are not preserved by specific objection in the lower court are waived and cannot be raised for the first time on appeal.").

issue, that none of the evidence pointed to anyone other than Appellant as being the shooter. Appellant's brief at 10-11. The testimony in question proceeded as follows:

> [Prosecutor:] Are there any witnesses or evidence that has been discovered in this case that points to anyone other than [Appellant] being the one that shot and killed [the victim]?
>
> [Agent Kontz:] No sir, there is not.

N.T. Trial, 10/31/16, at 57.[5]

Appellant argues that Agent Kontz's response in the negative "impermissibly embraced the ultimate issue," and "clearly usurped the fact-finding of the jury." Appellant's brief at 11. Appellant further contends that the agent's response was prejudicial, as "it was a summation of the evidence and his opinion that no evidence pointed to anyone other than the Appellant as the actual killer." *Id*. at 16. Appellant asserts that he "should be entitled to a trial which does not include the prosecuting officer testifying that the Appellant is guilty, and that no evidence says otherwise." *Id*. at 17.

Initially, we address Appellant's claim that Agent Kontz testified that "Appellant is guilty" and that "all of the evidence established that Appellant was the shooter." *Id*. at 12, 17. Upon close inspection, the certified record

---

[5] Again, we limit our review to the sole basis for Appellant's objection to this portion of Agent Kontz's testimony, which was that it "goes to the ultimate issue." *See* N.T. Trial, 10/31/16, at 56. *See Baumhammers*, *supra* at 73; Pa.R.E. 103(a); Pa.R.A.P. 302(a).

- 15 -

and the contents of the trial transcript do not support Appellant's assertion. Agent Kontz was not asked if he believed Appellant to be guilty; nor was he requested to affirmatively quantify how much of the evidence in the case pointed to Appellant. Instead, the agent was simply asked whether the investigation yielded evidence that pointed to any individual **other than** Appellant as the shooter. *See* N.T. Trial, 10/31/16, at 57. Agent Kontz's response was not a positive assertion of Appellant's guilt; rather, it was negative pronouncement of what the investigation did not uncover. *Id*.

We also disagree that Agent Kontz's response was inadmissible because it pertained to an ultimate issue. Pennsylvania Rule of Evidence 704 specifically provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Additionally, Rule 701 permits lay opinion testimony,[6] where the opinion is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue[.]" Pa.R.E. 701(a), (b). As the lead investigator, Agent Kontz was tasked with identifying all individuals who may have been directly or indirectly responsible for the murder. Agent Kontz's response was based on factual information within his personal knowledge as the lead investigator, and his testimony assisted the jury in understanding what evidence was **not** found during the comprehensive murder investigation. **See**

---

[6] Our review discloses that the Commonwealth did not seek to have Agent Kontz qualified as an expert witness, nor did the trial court so qualify him.

*Commonwealth v. Huggins*, 68 A.3d 962, 969 (Pa.Super. 2013) ("We have explained that [a] law-enforcement officer's testimony is a lay opinion if it is limited to what he observed . . . or to other facts derived exclusively from [a] particular investigation."). Thus, to the extent that the testimony can be construed as embracing an ultimate issue of fact, it did not violate the pertinent rules of evidence. Moreover, the trial court provided an immediate limiting instruction, advising the jury that "you're the finders of the fact. It's your determination as to what the evidence says and what the evidence points to that's controlling in this case." N.T. Trial, 10/31/16, at 56. As the jury is deemed to have followed this instruction, no relief is due. **See Commonwealth v. Simpson**, 66 A.3d 253, 269 (Pa. 2013) (holding that appellate courts presume that juries follow instructions).

Even if the admission of Agent Kontz's testimony was erroneous, the error was harmless. **See Commonwealth v. Green**, 162 A.3d 509, 519 (Pa.Super. 2017) (*en banc*) ("Not all errors at trial . . . entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial ...." (citation omitted)). As our High Court previously explained, "[a]n error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict." **Commonwealth v. Mitchell**, 839 A.2d 202, 214 (Pa. 2003). The

Commonwealth bears the burden to establish that the error was harmless, and satisfies that burden when it is able to show:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Passmore***, 857 A.2d 697, 711 (Pa.Super. 2004).

Based on our review of the certified record, the properly admitted and uncontradicted independent evidence of Appellant's guilt was so overwhelming, and the prejudicial effect of the ostensibly erroneous admission of Agent Kontz's limited testimony regarding the scope and results of the investigation so insignificant by comparison, that any error could not have contributed to the verdict. ***See id***. Multiple witnesses testified as to the day-long feud involving Appellant, Love, and the victim; Appellant's statements regarding his intent to shoot the victim; his unsuccessful efforts to obtain ammunition for the silver revolver; his retrieval of the assault rifle and ammunition from the storage facility; and his statements confirming that he had shot the victim. The jury was also presented with DNA and ballistics evidence that linked Appellant to the murder weapon and the ammunition used to shoot the victim. We therefore conclude that, even if the admission of either portion of Agent Kontz's testimony was error, it was harmless. ***See id***.; ***see also*** Appellant's brief at 16 (conceding that "the alleged admission of

[Agent Kontz's testimony] is arguably not of constitutional magnitude."). Accordingly, Appellant's first issue warrants no relief.

In his second issue, Appellant contends that the trial court erred by permitting the Commonwealth to introduce into evidence a portion of Appellant's recorded statement to Agent Kontz and Detective Sorage without redacting the officers' references to Love's purported statements to police. The portion of the statement in question reads as follows:

> AGENT KONTZ: I'm not sure why . . . Love's story, what he has told us, is the same as [Berrones']. [Love] says that you got out of the car and that you had the gun with you when you go out of the car.
>
> AGENT SORAGE: And [Love] said he's looking for you to man up to get him out of this because [Love] said that you were the one that had the gun.

Appellant's brief at 18 (citing Transcript of Videotaped Interview, 6/1/15, at 15-16).

Before Appellant's recorded statement was played to the jury, Appellant objected to the admission of the references to Love's out-of-court statements, and requested their redaction. N.T. Trial, 10/28/16, at 86-88. The trial court overruled the objection, explaining that the statements were not hearsay: "it's not so much for what [Agent] Kontz or [Detective] Sorage would have said, or even the substance of what they were saying, it was about [Appellant's] reaction to the statements . . ." *Id*. at 87-88. In its Pa.R.A.P. 1925(a) opinion, the trial court indicates that it "admitted the fabricated statements in order for the Commonwealth to show [Appellant's] reaction to them." *See* Trial

Court Opinion, 6/27/17, at 29. Thus, Love's purported out-of-court statements do not constitute hearsay because they were not admitted for their truth. *See Commonwealth v. Wilson*, 147 A.3d 7, 16 (Pa.Super. 2016) (testimony regarding out-of-court statement was not presented for its truth, but rather to demonstrate defendant's consciousness of guilt based on his response to the statement); *see also* Pa.R.E. 801, cmt. ("A statement is hearsay only if it is offered to prove the truth of the matter asserted in the statement. There are many situations in which evidence of a statement is offered for a purpose other than to prove the truth of the matter asserted.").

Nevertheless, Appellant contends that the admission of Love's statements violated his Sixth Amendment right to confront witnesses, as Love did not testify at Appellant's trial and was not available for cross-examination. Appellant's brief at 19 (citing *Bruton v. United States*, 391 U.S. 123 (1968)).[7] In *Bruton*, the trial court admitted into evidence at a joint trial the confession of Bruton's non-testifying co-defendant, which named and incriminated Bruton. The trial court instructed the jury that the confession could only be used against Bruton's co-defendant, and could not be considered as evidence against Bruton. *Id*. at 125 n.2. The Supreme Court acknowledged that, as a general matter, the presumption in the law is that

---

[7] Appellant further argues that Love's statements were inadmissible under the co-conspirator exception to the hearsay rule found at Pa.R.E. 803(25)(E). However, we decline to address this exception, as it was not the basis for the trial court's admission of Love's statements.

the jury will follow the court's instruction, but reasoned that, in some contexts, "the risk that the jury will not, or cannot, follow the judge's instructions is so great, and the consequences of such a failure so substantial for the defendant, that the practical and human limitations on the jury system cannot be ignored." **Id**. at 135. The Court held that the admission of the powerfully incriminating statement by the non-testifying co-defendant violated Bruton's right of confrontation under the Sixth Amendment of the United States Constitution, notwithstanding the jury charge. **Id**. at 135-36.

The Pennsylvania Supreme Court has ruled that **Bruton** is inapplicable to statements made by an individual other than a non-testifying co-defendant at a joint trial of co-defendants. **See Commonwealth v. McCrae**, 832 A.2d 1026, 1038 (Pa. 2003) ("**Bruton** applies, however, only in the context that gave rise to the decision, *i.e.*, the introduction of a powerfully incriminating statement made by a non-testifying co-defendant at a **joint** trial." (emphasis added)). Here, although Love and Appellant were co-defendants, **Bruton** is not implicated because their trials were severed. **See id**. Accordingly, there was no requirement, at least under **Bruton**, to redact the references to Love's statements.

However, our inquiry does not end here. As our Supreme Court has explained, "where a hearsay statement is not admitted against the non-declaring co-defendant as evidence, then the court must consider whether sufficient precautions have been taken to insulate the non-declaring co-

- 21 -

defendant from spillover prejudice due to the admission of the hearsay statement." ***Commonwealth v. Overby***, 809 A.2d 295, 301 (Pa. 2002). The Court continued, "Where the precautions are insufficient, then the admission of the statement violates the non-declaring co-defendant's right to confront and cross-examine the witnesses against him." ***Id***.

Appellant contends that he was prejudiced by the trial court's failure to provide an immediate limiting instruction when the statements attributable to Love were played to the jury. Appellant's brief at 21. Notably, Appellant did not request a limiting instruction at the time Appellant's recorded statement was played to the jury. Appellant concedes that the trial court gave the following limiting instruction to the jury in its general charge:

> Now, there was testimony presented during the trial that [Appellant] was confronted with statements allegedly made by . . . Love and I believe that was in the one statement that you heard, I think it was the audio statement. Those statements may not be considered by you as evidence of guilt or evidence for the truth of the matters discussed, but rather they are admitted for the limited purpose of illustrating the reaction and responses to those statements given by [Appellant to] those statements that were allegedly made by . . . Love.

N.T. Trial, 11/1/16, at 85. Appellant did not object to the timing or adequacy of the trial court's limiting instruction when it was given as part of the general charge, or propose a different or supplemental charge.

The law in this Commonwealth is that "a limiting instruction may be given either as the evidence is admitted or as part of the general charge." ***Overby***, ***supra*** at 315 n.1 (citing ***Commonwealth v. Covil***, 378 A.2d 841,

845 (Pa. 1977)). While the timing of such an instruction is discretionary, our Supreme Court has "emphasize[d] that it is better to give the limiting instruction at the time the evidence is admitted." **Covil**, **supra** at 845. Thus, while it would have been preferable in the case *sub judice* if the trial court had provided a limiting instruction to the jury at the time Appellant's recorded statement was played for the jury, the failure to do so was not, in itself, error, particularly when no request was made.[8] **See id**.

We now turn to the adequacy of the trial court's instruction, focusing on whether, under the circumstances of the case, the instruction was insufficient to protect Appellant's confrontation rights such that "in light of the other evidence, the only logical explanation for the jury's verdict convicting [Appellant of first-degree murder] was that the jury disregarded the court's limiting instruction regarding [Love's statements]." **McRae**, **supra** at 1039. Appellant points to the trial court's conclusion in its Pa.R.A.P. 1925(a) opinion that the statements attributed to Love were "fabricated" by police, and claims that the instruction provided was inadequate because the trial court did not specifically instruct the jury that the statements were fabricated. Appellant's brief at 21. Based on our review, however, the record is silent as to whether Love made the statements to police, or whether the statements attributed to

---

[8] Notably, the portion of Appellant's recorded statement in question was played to the jury on the morning of October 31, 2016, the sixth day of trial, which was the last day in which evidence was admitted into the record. The jury received the limiting instruction the next day.

- 23 -

Love were indeed fabricated by Agent Kontz and Detective Sorage for the purpose of interrogating Appellant. As we are unable to determine whether the statements attributed to Love were, in fact, fabricated, we cannot fault the trial court for not so instructing the jury. Nevertheless, in its limiting instruction, the trial court was careful to refer to the statements as "**allegedly** made by Love." **See** N.T. Trial, 11/1/16, at 85. Thus, the wording of the trial court's instruction made clear to the jury that the statements were suspect, and may not have been made by Love.

Further, disregard of the trial court's limiting instruction is not the only logical explanation for the jury's verdict. **See McRae**, **supra** at 1039. Although the statements attributed to Love, if improperly considered by the jury for their truth, would support the inference that Appellant shot the victim, their admission was insignificant to the case against Appellant in light of the other evidence. **Id**. The statements allegedly made by Love were consistent with the testimony of several witnesses who stated that Appellant retrieved the assault rifle from the storage facility, brought it to Berrones's home, was observed carrying the gun upon entering Love's car to go to the victim's house, and was seen carrying the gun upon arrival back at Berrones' home after the murder. We are satisfied that the trial court's limiting instruction was sufficient to protect Appellant's confrontation rights, notwithstanding the allegedly prejudicial reference to Love's statements. Thus, we find any error in the admission of Love's statements to be harmless error since, as discussed

- 24 -

*supra*, overwhelming independent evidence existed to prove that Appellant shot and killed the victim. **See Passmore**, **supra**. Accordingly, Appellant's second issue warrants no relief.

In his third issue, Appellant contends that the trial court erred by permitting the Commonwealth to introduce Berrones' testimony from Appellant's preliminary hearing as a prior consistent statement. Appellant submits that Berrones's preliminary hearing testimony was erroneously admitted because it was not given prior to the time an improper motive to fabricate would have arisen. According to Appellant, at the time of Appellant's preliminary hearing, Berrones had been charged with first-degree murder, incarcerated, and had waived his own preliminary hearing. Appellant argues that Berrones had a motive to fabricate at Appellant's preliminary hearing because he hoped to help himself in his own criminal case by testifying against Appellant. On this basis, Appellant submits that Berrones's preliminary hearing testimony should not have been admitted as a prior consistent statement at Appellant's trial.

"In general, prior consistent statements, as they constitute hearsay, are admissible under only very limited circumstances." **Baumhammers**, **supra** at 89. Pennsylvania Rule of Evidence 613(c) provides for the use of prior consistent statements at trial, and specifies as follows:

> **(c) Witness's Prior Consistent Statement to Rehabilitate**. Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement

and the statement is offered to rebut an express or implied charge of:

> **(1)** fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

> **(2)** having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

Pa.R.E. 613(c). To be admissible to rebut a charge of improper motive under subsection (c)(1), the prior consistent statement must have been made before the motivation to lie existed. *See Commonwealth v. Hutchinson*, 556 A.2d 370, 372 (Pa. 1989) (requiring that, to be admissible, a prior consistent statement must have been made before any corrupt motive has arisen). "[A] prior consistent statement is always received for rehabilitation purposes only and not as substantive evidence." *Commonwealth v. Busanet*, 54 A.3d 35, 67 (Pa. 2012) (citation omitted).

Given that Berrones had been charged with first-degree murder at the time of Appellant's preliminary hearing, we agree that Berrones may have had some motive to fabricate testimony against Appellant in order to secure a favorable plea agreement for himself. Thus, admission under Rule 613(c)(1) may not have been proper.[9]

---

[9] In its Pa.R.A.P. 1925(a) opinion, the trial court did not specify whether it permitted admission of Berrones's preliminary hearing testimony under subsection (c)(1) or subsection (c)(2). *See* Trial Court Opinion, 6/27/17, at 25-26. However, we may affirm on any legal basis appearing of record. *See Commonwealth v. Katona*, 191 A.3d 8, 16 (Pa.Super. 2018).

However, regardless of its admissibility under subsection (c)(1), a prior consistent statement is nonetheless admissible under subsection (c)(2) to rebut a charge of having made a prior inconsistent statement, regardless of the timing. As the official comment to Rule 613 explains:

> Pa.R.E. 613(c)(2) is arguably an extension of Pennsylvania law, but is based on the premise that when an attempt has been made to impeach a witness with an alleged prior inconsistent statement, **a statement consistent with the witness'[s] testimony should be admissible to rehabilitate the witness if it supports the witness'[s] denial or explanation of the alleged inconsistent statement**.

Pa.R.E. 613, Official Comment (emphasis added).

Here, defense counsel elicited testimony from Berrones on cross-examination that he had lied to police on multiple occasions during the murder investigation, and provided several inconsistent statements to investigators. N.T. Trial, 10/24/16, at 137-38, 144-45, 153, 158. On redirect-examination, Berrones explained that he had lied to police because he did not want to be charged with murder. *Id*. at 170-71. Berrones further explained that "I did at one point need to accept what I had done and tell the truth." *Id*. at 173. He then told police the true extent of his involvement in the crime, and was charged with first-degree murder. *Id*. at 174. Berrones stated that he testified truthfully at Appellant's preliminary hearing and on direct examination. *Id*. at 174-75. The preliminary hearing testimony supported Berrones' explanation because his preliminary hearing testimony was consistent with his trial testimony. Therefore, pursuant to Rule 613(c)(2), the

Commonwealth was permitted to introduce the prior consistent statements made by Berrones at Appellant's preliminary hearing in order to rehabilitate his testimony. Accordingly, Appellant's third issue entitles him to no relief.

In his fourth issue, Appellant contends that the trial court erred by permitting the Commonwealth to introduce the following portion of an intercepted phone call between Appellant and his stepmother[10] during which they discussed the fact that Appellant's DNA had been found on the murder weapon:

> Stepmother: Well I hope you learned your lesson. You always wipe your s**t off.
>
> Appellant: I been doing that.
>
> Stepmother: Don't trust nobody.

N.T. Trial, 10/21/16, at 9. Appellant objected to the excerpt on the basis of relevance and prior bad acts. *Id*. The trial court overruled the objection, concluding that the excerpt was admissible as a statement of a party opponent under Pa.R.E. 803(25)(B).[11] The trial court reasoned that Appellant's

---

[10] Appellant's stepmother is not identified by name in the notes of testimony. *See* N.T., 1/21/16, at 4 (wherein the trial court asked for the name of the stepmother, and defense counsel indicated that her name had not been identified).

[11] Subsection (25)(B) provides that an opposing party's statement is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness, when "[t]he statement is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true . . .." Pa.R.E. 803(25)(B).

response was a tacit "indicat[ion] that [he] wipes down guns, which is a method of reducing one's culpability for murder." Trial Court Opinion, 6/27/17, at 25. Appellant claims that even if the excerpt reflects his adoption of his stepmother's statement as true, it was not relevant to any factual issue at trial. Appellant's brief at 27.

Pennsylvania follows a traditional exception to the hearsay rule which admits implied admissions by the silent and acquiescing accused. *See* *Commonwealth v. Gribble*, 863 A.2d 455, 466 (Pa. 2004) (citing *Commonwealth v. Coccioletti*, 425 A.2d 387, 392 (Pa. 1981)). When inculpatory declarations are made in the defendant's presence, the law presumes that they "would naturally have been denied" if incorrect. *Coccioletti*, *supra* at 392.

In the instant case, Appellant's stepmother made a statement which implied that Appellant regularly handles guns in a manner which necessitates the wiping off of his fingerprints and DNA to prevent detection. We believe that this was the sort of statement which, "if incorrect, would naturally have been denied" by Appellant, particularly since he was prohibited from possessing or handling firearms due to a prior conviction. *Id*. However, not only did Appellant fail to deny this inculpatory statement, he acknowledged its truth by stating "I been doing that." Appellant's response manifested a belief in the truth of the content of his stepmother's statement. Accordingly, the

excerpt in question falls within Rule 803(25)(B)'s exception to the bar on hearsay.

Appellant further submits that the excerpt improperly implicates his prior bad acts. Appellant posits that his statement, "I been doing that," indicates that there were other occasions when he possessed guns and wiped them clean. He claims that the statement does not meet any of the exceptions for the admission of prior acts under Pa.R.E. 404(b)(2), such as motive, opportunity, intent, preparation, mistake, knowledge, or lack of accident. Appellant argues that, under Rule 404(b)(2), the trial court should have balanced the probative value of the statement against the prejudicial effect its admission had on Appellant's case.[12]

Pennsylvania Rule of Evidence 404(b) prohibits the admission of prior crimes, wrongs or acts except under certain circumstances:

**(b) Crimes, Wrongs or Other Acts**.

   (1)   *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

   (2)   *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this

---

[12] The trial court did not address this argument in its Pa.R.A.P. 1925(a) Opinion. While Appellant did not raise any particular basis for excluding the excerpt in his concise statement, he did make a timely objection raising Rule 404 at trial. *See* N.T., 10, 21, 16, at 9. Thus, we deem the issue preserved for our review.

> evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b).

The Commonwealth posits that Rule 404 does not apply because "[w]iping off a gun is not a bad act." Commonwealth's brief at 7. The Commonwealth's argument is misplaced. Although the term "prior bad acts" is commonly used in reference to Rule 404(b), the rule does not limit its application to acts that are "bad" or immoral in nature. ***Commonwealth v. Towles***, 106 A.3d 591, 602 n.6 (Pa. 2014). Indeed, Rule 404(b) makes no such distinction; it not only concerns prior crimes or "bad" conduct, but also relates to other acts or conduct. ***Id***.

Nevertheless, Rule 404(b) has no applicability in this context. Our Supreme Court has ruled that extrajudicial statements relating to a **specific** crime, wrong or act may be admissible so long as they do not constitute impermissible hearsay. ***See Commonwealth v. Johnson***, 160 A.3d 127, 145-46 (Pa. 2017) (emphasis added). Here, Appellant's statement "I been doing that," was not evidence of any **particular** crime, wrong or act. ***Id***. (concluding that Rule 404(b) was not implicated because the "alleged statements were not evidence of any particular 'crime, wrong or act' . . . Rather, they constituted mere statements of his desire to make money (or, more generally, to attain success) and his willingness to do anything (even to kill) to accomplish this end."). Here, Appellant's statement concerned his general habit or practice, rather than any specific crime, wrong or act. As a

result, Appellant's statement was not inadmissible under Rule 404(b). *See id*.

Finally, we address Appellant's claim that the excerpt was irrelevant. Here, Appellant was on trial for a murder that was accomplished with a firearm. Therefore, his statements regarding ownership, access, and handling of guns were relevant to the Commonwealth's case, as it increased the likelihood that he owns or has regular access to guns. *See Commonwealth v. Williams*, 640 A.2d 1251, 1260 (Pa. 1994) (holding that, at trial for first-degree murder accomplished with a firearm, admission into evidence of two guns possessed by defendant was proper as the guns were relevant to prove that defendant readily obtained and disposed of handguns). Additionally, as Appellant's DNA was found only on the magazine of the gun, his statement regarding his habit of wiping down guns that he handles was probative of whether he wiped down the murder weapon after he used it to shoot the victim. *See* Pa.R.E. 401, 402. Accordingly, Appellant's fourth issue warrants no relief.

In his fifth issue, Appellant contends that the trial court erred by admitting portions of three letters that Appellant wrote from prison to his then-girlfriend, Ms. Sedlock. Appellant sought to preclude admission of the letters in a pretrial motion *in limine*, which was denied as to, *inter alia*, letters marked 3B, 5A, and 7. Appellant first asserts that the trial court erred by admitting letter 3B, which included the following statements by Appellant:

but I will say that when a weapon is pulled and a threat is made towards me, my family, or my loved ones, (which would only be you and Jeromey at this point), then I would not be the one to hesitate to eliminate the threat. Someone I love to death once told me that one's offense is to be considered better than the opposing's defense. And that's as much you're going to get out of me.

Appellant's brief at 30 (quoting N.T. Trial, 10/31/16, at 48). Appellant objected to letter 3B based on relevance, claiming that it did not make any issue at trial more or less likely. He also claims that, if letter 3B is relevant, its probative value was greatly outweighed by its prejudicial impact. [13, 14]

In this case, letter 3B meets the test for relevance. Appellant's statement that, "when a weapon is pulled and a threat is made towards . . . my loved ones, . . . then I would not . . . hesitate to eliminate the threat" has a tendency to make Appellant's guilt more probable than without the evidence. N.T. Trial, 10/31/16, at 48. Berrones testified that Appellant and Love were very close, "like brothers," and that, when the victim threatened to blow Love's head off, Appellant became involved in the feud, telling the victim "if

---

[13] On appeal, Appellant also objects to letter 3B on the basis that it is cumulative to other evidence in the case. However, this challenge was not raised before the trial court in either Appellant's motion *in limine* or during the hearing at which his counsel stated the bases supporting the motion *in limine*. **See** N.T. Hearing, 10/18/16, at 4-5; Motion *in Limine*, 10/13/16, at unnumbered 3-4. Therefore, the issue was not preserved for our review. **See Baumhammers**, **supra** at 73; Pa.R.E. 103(a); Pa.R.A.P. 302(a).

[14] The trial court authored an opinion in support of its October 24, 2016 order, wherein it denied suppression of letter 3B; however, it offered no explanation for its ruling. **See** Trial Court Opinion, 11/29/16, at 18.

you have a problem with [Love] then you have a problem with me because that's family." N.T. Trial, 10/24/16, at 84. Thus, Appellant's letter 3B has probative value in establishing that Appellant considered Love as "family," and felt the need to "eliminate the threat" that had been made to Love by murdering the victim.

Further, we do not believe that the probative value of Appellant's statement in letter 3B was outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. **See** Pa.R.E. 403. In addition, we find any error in the admission of letter 3B to be harmless error since, as discussed *supra*, overwhelming independent evidence existed to prove that Appellant shot and killed the victim. **See Passmore**, **supra**. Accordingly, the admission of letter 3B warrants no relief.

Next, Appellant claims that the trial court erred by admitting letter 5A, wherein Appellant stated "[My attorneys] did tell me that at trial there's going to be no way around me having to get on the stand and testify on my behalf." Appellant's brief at 30 (quoting N.T. Trial, 10/31/16, at 53). Appellant claims that the statement was irrelevant.[15] The trial court concluded that letter 5A

---

[15] Appellant also claims that letter 5A is cumulative of other evidence in the case, and constituted an impermissible reference to his right not to testify. Appellant's brief at 31. Appellant waived these issues by failing to raise them before the trial court. **See Commonwealth v. Reason**, 402 A.2d 1358, 1359 n.3 (Pa. 1979) (concluding that appellant's challenge to a witness's reference

is admissible as an opposing party's statement under Pa.R.E. 803(25)(A), given that Appellant wrote and signed the letter, and Commonwealth offered the statement against him.[16] *See* Trial Court Opinion, 11/29/16, at 19-20; *see also See Commonwealth v. Barnes*, 871 A.2d 812, 818 (Pa.Super. 2005) (affirming admission of letters written by defendant under party opponent exception).

Even assuming that letter 5A qualified as a statement of a party opponent, we are not persuaded that the statement met the test for relevancy under Rule 401. In our view, the statement does not have a tendency to make Appellant's guilt more probable than without the evidence, particularly since Appellant had a constitutionally protected right not to take the stand and testify. Nevertheless, even if the admission of letter 5A was error, it was harmless since, as discussed *supra*, overwhelming independent evidence existed to prove that Appellant shot and killed the victim. *See Passmore*, *supra*. Accordingly, the admission of letter 5A warrants no relief.

_____

to appellant's ability to testify at trial was waived due to his failure to raise it before the trial court); Pa.R.E. 103(a); Pa.R.A.P. 302(a).

[16] Subsection (25)(A) provides that an opposing party's statement is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness, when "[t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity[.]"

Finally, Appellant contends that the trial court erred by admitting letter 7, wherein Appellant stated:

> The reason we decided to go with a jury is because with prior inconsistent statements (different stories from the same person) it is not up to a judge to decide whether that person is being truthful or not, it's solely up to a jury. I wouldn't of [sic] been able to raise the issue. Where as [sic] I raise the issue in front of a jury and they can in turn decide if that person can be believed or not. "It's like a game of chess, your strategy is not for your amusement and/or victory. It's to throw off your opponent of [sic] their game and give them no chance to recover a critical blow." – Bob Marley (Favorite Musician).

Appellant's brief at 31 (quoting N.T. Trial, 10/31/16, at 49). Appellant claims that the letter is irrelevant. *Id*. at 31-32. Appellant further argues that the letter is unduly prejudicial and lacks probative value. *Id*.[17] We disagree with both contentions.

In the case at bar, Appellant was interviewed at length by police, and provided them with three separate versions of the events on the day of the murder. *See* N.T. Trial, 10/31/16, at 5-7. Letter 7 meets the test for relevance because it bears on the credibility of Appellant's statements to

---

[17] The trial court provided the following limited analysis regarding its admission of Letter 7:

> The Commonwealth argues that [Appellant's] statement in his letter, discussing the trial strategy of choosing a jury, is not consistent with innocence[,] *i.e.*, "gaming the system." Ultimately the [c]ourt allowed the Commonwealth to admit the letter into evidence as [Appellant's] statements in the letter were inconsistent with statements made to police.

Trial Court Opinion, 11/29/16, at 19-20.

police, given his inconsistent versions of events. N.T. Trial, 10/31/16, at 53. The letter demonstrates that Appellant was concerned about his lack of credibility, and recognized that his chances of being perceived as "credible" were lower with a judge in a non-jury trial than with a jury in a jury trial. Thus, letter 7 has probative value regarding the credibility of Appellant's various statements to police.

Further, we do not believe that the probative value of Appellant's statements in letter 7 was outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. **See** Pa.R.E. 403. We also find any error in the admission of letter 7 to be harmless since, as discussed *supra*, overwhelming independent evidence existed to prove that Appellant shot and killed the victim. **See Passmore**, **supra**. Accordingly, the admission of letter 7 warrants no relief.

In his sixth issue, Appellant contends that the trial court erred by denying Appellant's request to question Berrones regarding his plea negotiations with the Commonwealth, including his rejection of a fifteen to forty-year plea offer, and his ultimate plea agreement to twelve to twenty-five years incarceration. Appellant argues that he should have been able to question Berrones about his bias in favor of the Commonwealth, "including inquiring about hopes for favorable treatment on [Berrones's] pending criminal charges." Appellant's brief at 34. Appellant asserts that he has the

right to cross-examine a witness about possible bias. *Id*. at 35. Appellant relies on *Commonwealth v. Evans*, 512 A.2d 626 (Pa. 1986), wherein this Court held:

> whenever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

*Id*. at 631-32.

In explaining its reasons for denying Appellant's request, the trial court stated:

> Berrones did testify that he was also charged with third-degree criminal homicide, conspiracy to commit criminal homicide, and tampering with the evidence. He testified that he pled [guilty] in exchange for a 12-25 year sentence in a state correctional institution.
>
> The Commonwealth submitted into evidence . . . the plea agreement between the Commonwealth and Berrones. Berrones had been incarcerated since the criminal complaint was filed in May of 2015. Before [Appellant's] trial and before Berrones testified, the [c]ourt accepted a plea from Berrones pursuant to the agreement . . . .
>
> Once a witness testifies, evidence of his bias, interest or corrupt motive is relevant impeachment evidence. The court instructed the jury on accomplice testimony, that it comes from a polluted

and corrupt source, and also gave the ["]False in One False in All["] instruction.[18]

Berrones testified that he lied to police. Defense counsel elicited from Berrones that he was false in his testimony at the preliminary hearing. The jury heard evidence with which they could have found Berrones not credible. . . . .

. . . . there was an agreement in place that had been tentatively accepted by the court taking Berrones' plea and the jury was made aware of that agreement and instructed as to the meaning of such an agreement. It was not necessary for further details of the plea negotiation process to be discussed.

Trial Court Opinion, 6/27/17, at 21-23 (citations to record and unnecessary capitalization omitted, footnote added).

Here, the agreement between Berrones and the Commonwealth was fully disclosed to the jury, and the trial court instructed the jury that Berrones's testimony was corrupt and suspect. *See Commonwealth v. Reed*, 446 A.2d 311, 314 (Pa.Super. 1982) (explaining that the rationale for requiring a full, fair, and honest disclosure of a promise or understanding is that it would have a significant bearing on the witness' motivation for testifying against appellant). Thus, we agree with the trial court's determination that sufficient information was provided to the jury regarding Berrones's plea agreement and possible bias, rendering as unnecessary any further

_____

[18] "'False in one, false in all' is a concept for assessing the weight of evidence. . . . It currently means that a jury may disregard the testimony of a witness if the jury believes that witness deliberately, or willfully and corruptly, testified falsely about a material issue." *Commonwealth v. Vicens-Rodriguez*, 911 A.2d 116, 117 (Pa.Super. 2006) (footnote omitted).

questioning regarding his rejection of a prior plea offer. Accordingly, Appellant's sixth issue entitles him to no relief.

In his final issue, Appellant challenges the discretionary aspects of his sentence by claiming that the trial court abused its discretion by imposing sentences consecutive to the life sentence imposed on his murder conviction. "Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa.Super. 2010). Prior to reaching the merits of a discretionary sentencing issue, this Court conducts

> a four[-]part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, [*see*] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [*see*] 42 Pa.C.S. § 9781(b).

*Moury*, *supra* at 170 (citation omitted). When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *Commonwealth v. Yanoff*, 690 A.2d 260, 267 (Pa.Super. 1997); *see also Commonwealth v. Tuladziecki*, 522 A.2d 17, 18 (Pa. 1987); 42 Pa.C.S. § 9781(b).

In the instant case, Appellant filed a timely notice of appeal, preserved his claims in a timely post-sentence motion, and included in his appellate brief a separate Rule 2119(f) statement. As such, he is in technical compliance with the requirements to challenge the discretionary aspects of his sentence.

*See Commonwealth v. Rhoades*, 8 A.3d 912, 916 (Pa.Super. 2010). However, a substantial question will be found "only where the appellant's Rule 2119(f) statement sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the [s]entencing [c]ode or a particular fundamental norm underlying the sentencing process" *Commonwealth v. Mouzon*, 812 A.2d 617, 627 (Pa. 2002). Thus, we will review Appellant's Rule 2119(f) statement to determine whether Appellant has presented a substantial question for our review.

In his Rule 2119(f) statement, Appellant submits that a substantial question is presented because the imposition of a sentence of twenty-five to fifty years incarceration consecutive to a mandatory life sentence "serves no purpose contemplated by the sentencing code." Appellant's brief at 8.

Appellant has neither argued that his sentence violates a specific provision of the sentencing scheme nor demonstrated that his sentence violates a fundamental norm underlying the sentencing process. *See Commonwealth v. Bromley*, 862 A.2d 598, 604 (Pa.Super. 2004) (finding that a claim that the sentence was excessive without identifying the manner in which the sentence violates either a specific provision of the sentencing scheme set for forth in the sentencing code or a particular fundamental norm underlying the sentencing process failed to raise a substantial question).

Moreover, under 42 Pa.C.S. § 9721, the sentencing court has discretion to impose sentences consecutively or concurrently and, ordinarily, a challenge

to the court's exercise of discretion in imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal. *See Commonwealth v. Gonzalez-Dejesus*, 994 A.2d 595, 598 (Pa.Super. 2010); *see also Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (Pa.Super. 1995) (explaining that a defendant is not entitled to a "volume discount" for his crimes). The imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment. *Gonzalez-Dejesus*, *supra* at 598 We examine such claims on a case-by-case basis. *Id*.

Upon review of the record, the trial court stated, relative to the consecutive sentences for criminal conspiracy and persons not to possess firearms, "[Appellant] was serving a state parole sentence at the time of the commission of these crimes, which is reason to be sentenced on every discrete crime for which he was found guilty that did not merge for sentencing purposes." Trial Court Opinion, 6/27/17, at 33. Additionally, the trial court considered that Appellant had a prior record score of five, had "slipped [his] electronic monitoring unit to evade detection by the Pennsylvania Board of Probation and Parole[,]" and that he was "in possession of firearms." N.T. Trial, 11/1/16, at 104.

Accordingly, in light of Appellant's criminal conduct, prior record score, violation of parole, and intentional detachment of his ankle monitor, we cannot state that his aggregate sentence of life in prison followed by twenty-five to fifty years incarceration is "unduly harsh." ***Gonzalez-Dejesus***, ***supra*** at 598. Thus, Appellant has not raised a substantial question regarding the consecutive nature of his sentence, and we deny his petition for review of the discretionary aspects of his sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2018

- 43 -